THE STANDARD OIL COMPANY OF NEW JERSEY
ET AL. *v.* THE UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF MISSOURI.

Argued March 14, 15, 16, 1910; restored to docket for reargument April 11,
1910; reargued January 12, 13, 16, 17, 1911.—Decided May 15, 1911.

The Anti-trust Act of July 2, 1890, c. 647, 26 Stat. 209, should be con-
strued in the light of reason; and, as so construed, it prohibits all
contracts and combination which amount to an unreasonable or
undue restraint of trade in interstate commerce.

The combination of the defendants in this case is an unreasonable
and undue restraint of trade in petroleum and its products moving
in interstate commerce, and falls within the prohibitions of the act
as so construed.

Where one of the defendants in a suit, brought by the Government in a
Circuit Court of the United States under the authority of § 4 of the
Anti-trust Act of July 2, 1890, is within the district, the court,
under the authority of § 5 of that act, can take jurisdiction and
order notice to be served upon the non-resident defendants.

Allegations as to facts occurring prior to the passage of the Anti-trust
Act may be considered solely to throw light on acts done after the
passage of the act.

The debates in Congress on the Anti-trust Act of 1890 show that one of the influences leading to the enactment of the statute was doubt as to whether there is a common law of the United States governing the making of contracts in restraint of trade and the creation and maintenance of monopolies in the absence of legislation.

While debates of the body enacting it may not be used as means for interpreting a statute, they may be resorted to as a means of ascertaining the conditions under which it was enacted.

The terms "restraint of trade," and "attempts to monopolize," as used in the Anti-trust Act, took their origin in the common law and were familiar in the law of this country prior to and at the time of the adoption of the act, and their meaning should be sought from the conceptions of both English and American law prior to the passage of the act.

The original doctrine that all contracts in restraint of trade were illegal was long since so modified in the interest of freedom of individuals to contract that the contract was valid if the resulting restraint was only partial in its operation and was otherwise reasonable.

The early struggle in England against the power to create monopolies resulted in establishing that those institutions were incompatible with the English Constitution.

At common law monopolies were unlawful because of their restriction upon individual freedom of contract and their injury to the public and at common law; and contracts creating the same evils were brought within the prohibition as impeding the due course of, or being in restraint of, trade.

At the time of the passage of the Anti-trust Act the English rule was that the individual was free to contract and to abstain from contracting and to exercise every reasonable right in regard thereto, except only as he was restricted from voluntarily and unreasonably or for wrongful purposes restraining his right to carry on his trade. *Mogul Steamship Co.* v. *McGregor*, 1892, A. C. 25.

A decision of the House of Lords, although announced after an event, may serve reflexly to show the state of the law in England at the time of such event.

This country has followed the line of development of the law of England, and the public policy has been to prohibit, or treat as illegal, contracts, or acts entered into with intent to wrong the public and which unreasonably restrict competitive conditions, limit the right of individuals, restrain the free flow of commerce, or bring about public evils such as the enhancement of prices.

The Anti-trust Act of 1890 was enacted in the light of the then existing practical conception of the law against restraint of trade, and the intent of Congress was not to restrain the right to make and enforce contracts, whether resulting from combinations or otherwise, which do not unduly restrain interstate or foreign commerce, but to protect that commerce from contracts or combinations by methods, whether old or new, which would constitute an interference with, or an undue restraint upon, it.

The Anti-trust Act contemplated and required a standard of interpretation, and it was intended that the standard of reason which had been applied at the common law should be applied in determining whether particular acts were within its prohibitions.

The word "person" in § 2 of the Anti-trust Act, as construed by reference to § 8 thereof, implies a corporation as well as an individual.

The commerce referred to by the words "any part" in § 2 of the Anti-trust Act, as construed in the light of the manifest purpose of that act, includes geographically any part of the United States and also any of the classes of things forming a part of interstate or foreign commerce.

The words "to monopolize" and "monopolize" as used in § 2 of the Anti-trust Act reach every act bringing about the prohibited result.

Freedom to contract is the essence of freedom from undue restraint on the right to contract.

In prior cases where general language has been used, to the effect that reason could not be resorted to in determining whether a particular case was within the prohibitions of the Anti-trust Act, the unreasonableness of the acts under consideration was pointed out and those cases are only authoritative by the certitude that the rule of reason was applied; *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290, and *United States* v. *Joint Traffic Association*, 171 U. S. 505, limited and qualified so far as they conflict with the construction now given to the Anti-trust Act of 1890.

The application of the Anti-trust Act to combinations involving the production of commodities within the States does not so extend the power of Congress to subjects *dehors* its authority as to render the statute unconstitutional. *United States* v. *E. C. Knight Co.*, 156 U. S. 1, distinguished.

The Anti-trust Act generically enumerates the character of the acts prohibited and the wrongs which it intends to prevent and is susceptible of being enforced without any judicial exertion of legislative power.

The unification of power and control over a commodity such as pe-

troleum, and its products, by combining in one corporation the stocks of many other corporations aggregating a vast capital gives rise, of itself, to the *prima facie* presumption of an intent and purpose to dominate the industry connected with, and gain perpetual control of the movement of, that commodity and its products in the channels of interstate commerce in violation of the Anti-trust Act of 1890, and that presumption is made conclusive by proof of specific acts such as those in the record of this case.

The fact that a combination over the products of a commodity such as petroleum does not include the crude article itself does not take the combination outside of the Anti-trust Act when it appears that the monopolization of the manufactured products necessarily controls the crude article.

Penalties which are not authorized by the law cannot be inflicted by judicial authority.

The remedy to be administered in case of a combination violating the Anti-trust Act is two-fold: first, to forbid the continuance of the prohibited act, and second, to so dissolve the combination as to neutralize the force of the unlawful power.

The constituents of an unlawful combination under the Anti-trust Act should not be deprived of power to make normal and lawful contracts, but should be restrained from continuing or recreating the unlawful combination by any means whatever; and a dissolution of the offending combination should not deprive the constituents of the right to live under the law but should compel them to obey it.

In determining the remedy against an unlawful combination, the court must consider the result and not inflict serious injury on the public by causing a cessation of interstate commerce in a necessary commodity.

173 Fed. Rep. 177, modified and affirmed.

THE facts, which involve the construction of the Sherman Anti-trust Act of July 2, 1890, and whether defendants had violated its provisions, are stated in the opinion.

*Mr. John G. Johnson* and *Mr. John G. Milburn*, with whom *Mr. Frank L. Crawford* was on the brief, for appellants:

The acquisition in 1899 by the Standard Oil Company of New Jersey of the stocks of the other companies was not a combination of independent enterprises. All of the

companies had the same stockholders who in the various corporate organizations were carrying on parts of the one business. The business as a whole belonged to this body of common stockholders who, commencing prior to 1870, had as its common owners gradually built it up and developed it. The properties used in the business, in so far as they had been acquired by purchase, were purchased from time to time with the common funds for account of the common owners. For the most part the plants and properties used in the business in 1899 had not been acquired by purchase but were the creation of the common owners. The majority of the companies, and the most important ones, had been created by the common owners for the convenient conduct of branches of the business. The stocks of these companies had always been held in common ownership. The business of the companies and their relations to each other were unchanged by the transfer of the stocks of the other companies to the Standard Oil Company of New Jersey.

The Sherman Act has no application to the transfer to, or acquisition by, the Standard Oil Company of New Jersey of the stocks of the various manufacturing and producing corporations, for the reason that such transfer and acquisition were not acts of interstate or foreign commerce, nor direct and immediate in their effect on interstate and foreign commerce, nor within the power of Congress to regulate interstate and foreign commerce. *United States* v. *Knight,* 156 U. S. 1; *In re Greene,* 52 Fed. Rep. 104.

The contracts, combinations and conspiracies of § 1 of the Sherman Act are contracts and combinations which contractually restrict the freedom of one or more of the parties to them in the conduct of his or their trade, and combinations or conspiracies which restrict the freedom of others than the parties to them in the conduct of their business, when these restrictions directly affect interstate

or foreign trade. Purchases or acquisitions of property are not in any sense such contracts, combinations or conspiracies. Contracts in restraint of trade are contracts with a stranger to the contractor's business, although in some cases carrying on a similar one, which wholly or partially restricts the freedom of the contractor in carrying on that business as otherwise he would. Holmes, J., in *Northern Securities Case,* 193 U. S. 404; Pollock on Contracts, 7th ed., p. 352. Such contracts are invalid because of the injury to the public in being deprived of the restricted party's industry and the injury to the party himself by being precluded from pursuing his occupation. *Oregon Steam Navigation Co.* v. *Windsor,* 20 Wall. 68; *Alger* v. *Thacker,* 19 Pick. 54. Combinations in restraint of trade are combinations between two or more persons whereby each party is restricted in his freedom in carrying on his business in his own way. *Hilton* v. *Eckersley,* 6 El. & Bl. 47.

The cases in which combinations have been held invalid at common law as being in restraint of trade deal with executory agreements between independent manufacturers and dealers whereby the freedom of each to conduct his business with respect to his own interest and judgment is restricted. *Morris Run Coal Co.* v. *Barclay Coal Co.,* 68 Pa. St. 173; *Salt Co.* v. *Guthrie,* 35 Oh. St. 666; *Arnot* v. *Pittston and Elmira Coal Co.,* 68 N. Y. 558; *Craft* v. *McConoughy,* 79 Illinois, 346; *India Bagging Association* v. *Kock,* 14 La. Ann. 168; *Vulcan Powder Co.* v. *Hercules Powder Co.,* 96 California, 510; *Oil Co.* v. *Adoue,* 83 Texas, 650; *Chapin* v. *Brown,* 83 Iowa, 156.

The cases in which trusts and similar combinations have been held invalid as combinations in restraint of trade all deal with devices employed to secure the centralized control of separately owned concerns. *People* v. *North River Sugar Refining Co.,* 54 Hun, 354; *S. C.,* 121 N. Y. 582; *State* v. *Nebraska Distilling Co.,* 29 Nebraska, 700; *Poca-*

*hontas Coke Co.* v. *Powhatan Coal & Coke Co.,* 60 W. Va. 508.

A conspiracy in restraint of trade is a combination of two or more to deprive others than its members of their freedom in conducting their business in their own way by acts having that effect. A combination to boycott is a sufficient illustration.

The Sherman Act did not enlarge the category of contracts, combinations and conspiracies in restraint of trade. *United States* v. *Trans-Missouri Association,* 166 U. S. 290; *United States* v. *Joint Traffic Association,* 171 U. S. 505; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211; *Montague* v. *Lowry,* 193 U. S. 38; *Swift* v. *United States,* 196 U. S. 375; *Loewe* v. *Lawlor,* 208 U. S. 274; *Continental Wall Paper Co.* v. *Voight & Sons,* 212 U. S. 227, all involved combinations, either expressly by the terms of the agreements constituting them, restricting the freedom of each of the members in the conduct of his or its business, or in the nature of conspiracies to restrict the freedom of others than their members in the conduct of their business. The *Northern Securities Case,* 193 U. S. 197, was a combination which, through the device adopted, restricted the freedom of the stockholders of two independent railroad companies in the separate and independent control and management of their respective companies.

Purchases and acquisitions of property do not restrain trade. The freedom of a trader is not restricted by the sale of his property and business. The elimination of competition, so far as his property and business is concerned, is not a restraint of trade, but is merely an incidental effect of the exercise of the fundamental civil right to buy and sell property freely. The acquisition of property is not made illegal by the fact that the purchaser intends thereby to put an end to the use of such property in competition with him. Every purchase of

property necessarily involves the elimination of that prop-
erty from use in competition with the purchaser and, there-
fore, implies an intent to effect such elimination. *Cin-
cinnati Packet Co.* v. *Bay*, 200 U. S. 179.

The transfer to, and acquisition by, the Standard Oil
Company of New Jersey of the stocks of the various
corporations in the year 1899 was not, and the continued
ownership of those shares with the control which it con-
fers is not, a combination or conspiracy in restraint of
trade declared to be illegal by the first section of the
Sherman Act. Because of the common ownership of the
different properties in interest they were not independent
or competitive but they were the constituent elements of
a single business organism. This situation was not af-
fected by the transfer to the Standard Oil Company of
New Jersey, who had the same body of stockholders and
had controlled the separate companies and continued to
control them through the Standard Oil Company of New
Jersey. These considerations differentiate the present
case from the *Northern Securities Case*, 193 U. S. 197.
The *Northern Securities Case* dealt with a combination of
diverse owners of separate and diverse properties which
were bound by the law of their being as quasi-public
corporations invested with public franchises to continue
separate, independent and competitive, creating through
the instrumentality of the holding company a common
control which would necessarily prevent competitive
relations.

There is no warrant for the assumption that corpor-
ations engaged in the same business are naturally or
potentially competitive regardless of their origin or owner-
ship. If the same body of men create several corpora-
tions to carry on a large business for the economical ad-
vantages of location or for any other reason, and the
stocks of these corporations are all in common owner-
ship, it is a fiction to say that they are potentially com-

petitive or that their natural relation is one of competition.

The common owners of the Standard Oil properties and business had the right to vest the properties and business in a single corporation, notwithstanding that such a transaction might tend to prevent the disintegration of the different properties into diverse ownerships. The Sherman Act does not impose restrictions upon the rights of joint owners.

The acquisitions prior to 1882 were lawful and their effect upon competition was incidental. The purpose of the trust of 1879 was to bring the scattered legal titles to the joint properties then vested in various individuals into a single trusteeship. The purpose of the Trust Agreement of 1882 was to provide a practicable trusteeship to hold the legal title to the joint properties, an effective executive management and a marketable symbol or evidence of the interest of each owner. The only question raised in the case of *State* v. *Standard Oil Company,* 49 Oh. St. 137, was whether it was *ultra vires* for the Standard Oil Company of Ohio to permit its stock to be held by the trustees instead of by the real owners. The method of distribution adopted on the dissolution of the trust was the only feasible plan of distribution. Each certificate-holder was given an assignment of his proportionate interest in all the companies. All being parts of the common business there was no basis for separate valuations. The value of the interest of every owner was dependent upon its being kept together as an entirety. The transaction of 1899 was practically an incorporation of the entire business by the common owners through the ownership of the Standard Oil Company of New Jersey. That was the plain purpose, object and effect of the transaction.

The first section of the Sherman Act deals directly with contracts, combinations and conspiracies in restraint of trade. The second section deals directly with monopoliz-

ing and attempts to monopolize. Monopolizing does not enlarge the operation of the first section nor does its absence restrict the operation of that section.

The first section deals with entities, a contract, combination, a conspiracy; and the entities themselves are expressly declared to be illegal, and may be annulled or destroyed. The second section deals with acts.

At common law monopoly had a precise definition. Blackstone, Vol. 4, p. 160; *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 756. Monopoly imports the idea of exclusiveness and an exclusiveness existing by reason of the restraint of the liberty of others. With the common-law monopoly the restraint resulted from the grant of the exclusive right or privilege. Under the Sherman Act there must be some substitute for the grant as a source of the exclusiveness and restraint essential to monopolizing. The essential element is found in the statement of Judge Jackson (*In re Greene*, 52 Fed. Rep. 116) that monopolizing is securing or acquiring "the exclusive right in such trade or commerce by means which prevent or restrain others from engaging therein." Exclusion by competition is not monopolizing. Pollock on Torts, 8th ed., p. 152; *Mogul Case*, L. R. 23 Q. B. D. 615; (1892) App. Cas. 51. Monopolizing within the act is the appropriation of a trade by means of contracts, combinations or conspiracies in restraint of trade or other unlawful or tortious acts, whereby "the subject in general is restrained from that liberty of . . . trading which he had before." In the absence of such means or agencies of exclusion, size, aggregated capital, power, and volume of business are not monopolizing in a legal sense.

*Swift* v. *United States*, 196 U. S. 375, was the case of a combination of corporations, firms and individuals separately and independently engaged in the business, together controlling nearly the whole of it, to monopolize it by certain acts and courses of conduct effective to

that end when done and pursued by such a combination.

*Richardson* v. *Buhl,* 77 Michigan, 632; *People* v. *North River Sugar Refining Co.,* 54 Hun, 354; *State* v. *Standard Oil Co.,* 49 Oh. St. 137; *State* v. *Distillery Co.,* 29 Nebraska, 700; *Distilling Co.* v. *People,* 156 Illinois, 448, and *Anderson* v. *Shawnee Compress Co.,* 209 U. S. 423, rest upon special grounds and are not applicable to this case. See on the other hand, *In re Greene,* 52 Fed. Rep. 104, Jackson, J.; *Trenton Potteries Co.* v. *Oliphant,* 58 N. J. Eq. 507; *Oakdale Co.* v. *Garst,* 18 R. I. 484; *State* v. *Continental Tobacco Co.,* 177 Missouri, 1; *Diamond Match Co.* v. *Roeber,* 106 N. Y. 473; *Davis* v. *Booth & Co.,* 131 Fed. Rep. 31; *Robinson* v. *Brick Co.,* 127 Fed. Rep. 804. The acquisition of existing plants or properties however extensive, though made to obtain their trade and eliminate their competition, is not a monopoly at common law or monopolizing under the Sherman Act, in the absence of the exclusion of others from the trade by conspiracies to that end or contracts in restraint of trade on an elaborate and effective scale, or other systematic, wrongful, tortious or illegal acts. When such monopolizing is present the remedy of the act is to prohibit the offending conspiracies, contracts, and illegal acts or means of exclusion, leaving the individual or corporation to pursue his or its business with the properties and plants that have been acquired or created shorn of the monopolizing elements in the conduct of the business.

The acquisition of competing plants and properties cannot be rendered unlawful by imputing to such acquisitions an intent to monopolize. The acquisition of plants and properties does not exclude anyone from the trade and therefore the intent to monopolize cannot be attributed to such acquisitions. The proposition that an acquisition of property is rendered invalid because of a collateral intent to monopolize is not sustained by the

authorities relied upon to support it. *Addyston Pipe Case*, 85 Fed. Rep. 291, and cases there cited. The substantial acquisitions made by the owners of the Standard Oil business antedated the Sherman Act and they resulted from separate transactions extending over a long period of years. They were in all cases accretions to an existing business. They formed an insignificant part of the business as it now exists. The Sherman Act is intended to prevent present monopolizing or attempts to monopolize. Whether acquisitions made many years ago were or were not associated with an attempt to monopolize has no relation with the present attempt at monopolizing.

The Standard Oil Company of New Jersey was not monopolizing, or attempting to monopolize, or combining with anyone else to monopolize, interstate and foreign trade in petroleum and its products when this proceeding was instituted, or at any time.

The ownership of the pipe lines has not been a means of monopolizing. Substantially all of the pipe lines owned by the Standard Oil companies have been constructed by those companies. There has never been any exclusion of anyone from the oil fields either in the production of oil, or its purchase, or its storage, or its gathering or transportation by pipe lines. Ownership of the pipe lines does not give the Standard companies any advantages in dealing with the producers which are not open to others.

The decree erroneously includes and operates upon several of the appellant companies.

The sixth section of the decree is unwarranted and impracticable in various of its provisions.

It was error to deny the motion of the appellants to vacate the order permitting service upon them outside of the Eastern Division of the Eastern District of Missouri, and to set aside the service upon them of the writs of subpœna issued thereunder; and error to overrule the pleas of the appellants to the jurisdiction of the court

over them.   The appellants were not residents of the
Eastern District of Missouri nor were they found therein
when the order was made authorizing the service of
process upon them outside of the district.   There was no
proceeding pending in that district involving a contro-
versy for the determination of which the appellants were
necessary parties.

*Mr. D. T. Watson,* also for appellants:

The Government has failed to maintain the affirmative
of the issue made by the pleadings.  *Brent* v. *The Bank,* 10
Pet. 614; *The Siren,* 7 Wall. 154; *United States* v. *Stinson,*
197 U. S. 200, 205.

The transfer in 1899 to the Standard Oil Company of
New Jersey of the various non-competitive properties
jointly used by them as one property was not a restriction
of interstate trade, or an attempt to monopolize, or a
violation of the Sherman Act.

The Sherman Act permits trusts, combines, corpora-
tions and individuals to enter into and compete for inter-
state trade so long as they act lawfully.  It does not seek
to regulate the methods nor forbid those who enter into
trade from doing their business in the form of a trust,
corporation or combine, provided they carry it on
lawfully.

The Standard Oil Company of New Jersey after 1899
might legitimately and properly compete for interstate
trade, notwithstanding the combination of the group of
properties gave it a great power, only provided it did not
restrain such trade or by unlawful means seek to gain a
monopoly contrary to the provisions of the Sherman Act.

There is nothing in this case to show that after 1899
the combination did unlawfully compete, restrict or seek
to monopolize interstate trade; yet such evidence was
indispensable to prove that the combination was violat-
ing the Sherman Act in 1906.  See the *Calumet & Hecla*

*Case,* Judge Knappen, 167 Fed. Rep. 709, 715; Judge Lurton, 167 Fed. Rep. 727, 728; Judge Gray in *United States* v. *Reading Co.,* decided December 8, 1910.

There is a great difference between the *Northern Securities Case* and the case at bar.

On the question of potential competition, the idea of competition between properties all owned by the same persons is a novelty. The idea that properties themselves compete, and that if one man owns two or more he must compete with himself, is startling. Competition between joint owners is also novel. *Fairbanks* v. *Leary,* 40 Wisconsin, 642, 643; *Whitwell* v. *Continental Tobacco Co.,* 125 Fed. Rep. 454.

Competition is the striving of two or more persons, or corporations, either individually or jointly, for one thing, i. e., trade; it is personal action; the strife between different persons. Properties do not compete. Their relative locations may more readily enable their owners to use them in competition, but of themselves and as against each other, they do not compete.

This idea makes the Sherman Act read that the same person or group of individuals shall not own and operate two or more sites for refineries or for stores or for any kind of manufactories which might be used by different owners in competition. *Joint Traffic Association Case,* 171 U. S. 505, 567.

The words "potential" or "naturally competitive" are not in the Sherman Act. *Cascade Railroad Co.* v. *Superior Court,* 51 Washington, 346. The rule of potential competition refers only to the ownership of the physical properties which produce the oil which goes into interstate commerce, and not to the oil itself. *United States* v. *E. C. Knight Co.,* 156 U. S. 1; *Northern Securities Co.* v. *United States,* 193 U. S. 407.

The Sherman Act is a highly penal one. In a criminal prosecution under the act the degree of proof is beyond a

reasonable doubt.   In a civil suit under it, the degree is not so great, but the proof must be direct, plain and convincing.   *United States* v. *Trans-Missouri Freight Assn.*, 58 Fed. Rep. 77; *Northern Securities Co.* v. *United States*, 193 U. S. 197, 401; *State* v. *Continental Tobacco Co.*, 177 Mississippi, 1.

There is a distinction between private traders and railroad companies; and see also distinction under Sherman Act between quasi-public corporations and private traders. *Trans-Missouri Case*, 166 U. S. 290.

The mere method in which stocks are held is not prescribed by the Sherman Act; all methods are lawful if not used to restrict trade or gain an unlawful monopoly. Under the court's ruling the effectiveness of a large business organization may, by reason of that very fact, bring it under the Sherman Act.

The decree below was not justified by the facts found by the court; or by the Sherman Act; after the court in § 5 permitted the distribution among the shareholders of the Standard Oil Company of New Jersey of the stocks held by that company, it did without lawful authority so to do, define and limit the method of that distribution; restrict the distributees in the future sale, use and disposal of their stocks; restrict the distributees in the sale, use and disposal of their properties; and in the contract relations thereafter to exist, as well as the use and disposition of the different properties in such a drastic manner as to greatly injure and destroy the value of the same and render their future profitable use practically impossible. The decree disintegrates properties built with appellants' moneys for joint use so as to create units that never before existed and compels these units separately to carry on business and compete with other units, directly contrary to the purpose of their creation.   It allows the future operation and use of the refineries, pipe lines, and other properties of the appellants only under the vague and

indefinite, but broad and comprehensive, terms of § 6 of the decree, by subjecting those who in the future operate them to attachment for contempt for unwittingly violating vague and indefinite terms. It prohibits appellants from engaging in all interstate commerce until the discontinuance of the operation of the illegal combination, thus inflicting a new penalty for an indefinite and uncertain period.

All of such restrictions are unauthorized by the Sherman Act, are in violation of the settled rules governing injunctions, and are contrary to the provisions of the different decrees heretofore approved by this court under the Sherman Act, and especially the one in the *Northern Securities Case.*

The decree authorized by the Sherman Act is wholly negative, and one that merely enjoins—stops an illegal thing in operation when the petition is filed or which then is foreseen. *Lacassagne* v. *Chapius*, 144 U. S. 124; *E. C. Knight Co. Case*, 156 U. S. 1, 17; *Harriman* v. *Northern Securities Co.*, 197 U. S. 244, 289; *Swift & Co.* v. *United States*, 196 U. S. 375, 402; *United States* v. *Reading Co.*, decided by Circuit Court of the Third Circuit, December 8, 1910.

The Sherman Act prescribes certain specific methods of relief which are exclusive of all others. Noyes on Intercorporate Relations, 2d ed., 1909, § 406; *Greer, Mills & Co.* v. *Stoller*, 77 Fed. Rep. 1, 3; *Minnesota* v. *Northern Securities Co.*, 194 U. S. 48, 71; *Barnet* v. *National Bank*, 98 U. S. 555, 558; *East Tennessee R. R. Co.* v. *Southern Tel. Co.*, 112 U. S. 306, 310; *Farmers' Bank* v. *Dearing*, 91 U. S. 29, 35; *United States* v. *Union Pacific Railroad Co.*, 98 U. S. 569.

The decree hampers and greatly injures the value of the stock of the stockholders, though they are not parties to the bill.

A corporation, when party to a bill in equity, does rep-

resent its stockholders, but only within the scope of corporate power, and not as to the individual rights of the stockholder to do with his property as he chooses. *Taylor & Co.* v. *Southern Pacific Co.*, 122 Fed. Rep. 147, 153, 154. A corporation has no right to conclude or affect the right of any shareholder in respect of the ownership or incidents of his particular shares. *Brown* v. *Pacific Mail Steamship Co.*, Fed. Cas. No. 2025; 5 Blatch. 525; *Morse* v. *Bay State Gas Co.*, 91 Fed. Rep. 944, 946; *Harriman* v. *Northern Securities Co.*, 197 U. S. 244, 288–290.

The decree follows the appellants and their properties after the dissolution.

The Sherman Act closely limits and defines the power of the court on a petition filed to give equitable relief. The petition must pray that such violations shall be enjoined or otherwise prohibited; and it is these violations of the act that the court may now enjoin, and only such violations. Past unlawful competition does not deprive parties of their right to conduct lawful competition. *New Haven R. R. Case*, 200 U. S. 361, 404.

The Sherman Act does not give power to the courts to strike down and disintegrate a non-competing group of physical properties used to manufacture an article of trade. These physical properties are bought and held and used under state laws; they do not enter into interstate commerce and hence are not under Federal control. *New Haven R. R. Co.* v. *Interstate Com. Comm.*, 200 U. S. 361, 404; *State* v. *Omaha Elevator Co.*, 75 Nebraska, 637.

The effect of the decree is ruinous. For instance, these companies jointly own 54,616 miles of pipe lines, of which the seven individual defendants and their associates built over 50,000 miles, in which they have an investment of over $61,000,000.

The decree splits up this pipe line system into eleven parts, takes away from the owners, who jointly built the pipe lines and who created the sub-companies, all control

over the different sub-companies, and compels the eleven different parts to stand alone, independently of their principal and of each other, to be hostile to and to compete with their principal and with one another.

Pipe lines are never parallel but always continuous, and each line has a value which depends wholly upon its connection with other parts of the system, and whether all are used together as one whole. The carrying out of the decree would cut the pipe line system into isolated segments, prevent such use, and make the successful operation of the pipe lines impossible.

The decree would especially destroy the value of the stock of all shareholders who each had five shares or less. The stockholders on August 19, 1907, holding from one to four shares each numbered 1,157, and the stockholders owning five shares each numbered 439, out of a total number of 5,085 stockholders.

Considering the case *de novo*, and not on the findings of the court below, it is not true that when the petition in this case was filed in 1906, the seven individual appellants and their associates, private traders in oil, were, contrary to the provisions of the Sherman Act, carrying on a conspiracy to restrain interstate and foreign trade in oils, and to gain by illegal means a monopoly thereof.

The Federal law allowed and allows each of the individuals to compete freely for the interstate and foreign traffic in oil and its products. He may use all the weapons that his ingenuity and skill can suggest, to wage a successful warfare. His rights to compete are not limited to merely such means as are fair or reasonable, but are only limited to such as are unlawful and directly tend to the violation of the Sherman Act. The Federal law also allows and assures to each competitor whatever share, however large, of the interstate or foreign trade in oil he or they may win provided his means are not unlawful. The Sherman Act was passed to protect trade and further

competition.   It makes such restraint and monopoly a crime and inflicts, on conviction, severe penalties for such offense.   It permits one set of competitors to purchase the property of other competitors solely to avoid further competition.   The mere size of the competing corporations or combinations is immaterial.

The monopoly of a trade at common law was forbidden because, and only because, it excluded all others from practicing such trade, and seems to have been then limited to a royal grant, as, for example, giving the exclusive right to manufacture playing cards.   It was and is a distinct thing from engrossing, regrating or forestalling the market, all of which were based on the prevention of artificial prices for the necessaries of life.   No one of these falls under Federal jurisdiction, but each is subject to state control only.

The present litigation is between the Federal Government and certain of its citizens.   The questions involved are solely the rights of these Federal citizens and the effect upon those rights of the Sherman Act, and whether these Federal citizens have violated the provisions of that act.

There was and is no such thing as a Federal crime, aside from express congressional acts, and as no such act was in existence prior to 1890, as to the matters charged in the petition, all the matters and things done by the defendants prior thereto are immaterial.

This case involves, and only involves, the question of the restraint and monopolization of interstate and foreign trade in oil in November, 1906, when the petition was filed; it does not involve any alleged restraint or monopoly of the oil industry in any of the States.

The appellants were lawfully entitled to so hold and use in interstate trade all of its combined properties.

To succeed in this case, the Government must also show that the said Standard Oil Company was then in 1906

using its power to actually restrain interstate or foreign trade in oil, or was then in 1906 excluding or attempting to exclude by illegal means others from said trade and attempting to monopolize the same, or a part thereof.

The Sherman Act does not compel private traders, however organized, to compete with each other. The character of the oil business was and is such that a great corporation was and is an economic necessity for carrying on that industry. The growth and success of the Standard Oil Company was the result of individual enterprise and the natural laws of trade. It was not the result of unlawful means, but of skill, unremitting toil, denials and hardships, and is an instance of where the continuous use for forty years of skill, labor and capital reached a great success.

To prove a violation of § 1 of the Sherman Act the Government must clearly show that when the petition was filed appellants were then actually restraining interstate trade in oil.

To prove a monopoly under § 2 of the Sherman Act, the Government must show that the appellants were, when the petition was filed, then using unlawful means to maintain their control of the industry and that the appellants were then by unlawful means excluding others from said industry.

*The Attorney General* and *Mr. Frank B. Kellogg,* with whom *Mr. Cordenio N. Severance* was on the brief, for the United States:

It is immaterial that this conspiracy had its inception prior to the enactment of the Sherman Law, or that many of the rebates and discriminations granted by the railroads which enabled the defendants to monopolize the commerce in petroleum antedated the enactment of the Interstate Commerce Act; the principles of the common law applied to interstate as well as to intrastate com-

merce.  *Western Union Telegraph Co.* v. *Call Pub. Co.,*
181 U. S. 92; *Murray* v. *C. & N. W. R. Co.,* 62 Fed. Rep.
24; *Interstate Com. Comm.* v. *B. & O. R. Co.,* 145 U. S.
263; *Bank of Kentucky* v. *Adams Express Co.,* 93 U. S.
174; *National Lead Co.* v. *Grote Paint Store Co.,* 80 Mo.
App. 247; *People* v. *Chicago Gas Trust,* 130 Illinois, 268;
*Richardson* v. *Buhl,* 77 Michigan, 632; *State* v. *Nebraska*
*Distilling Co.,* 29 Nebraska, 700; *Distilling & Cattle Feed-*
*ing Co.* v. *People,* 156 Illinois, 448.

From the earliest date these various corporations were
held together by trust agreements which were void at
common law.  But whether they were void or not, the
combination was a continuing one; there was no vested
right by reason of the acquisition of these stocks by the
trustees, and when the Sherman Act was passed the con-
tinuance of the combination became illegal.  *United States*
v. *Freight Association,* 166 U. S. 290, cited and approved
in *Waters-Pierce Oil Co.* v. *Texas,* 212 U. S. 86; *Thompson*
v. *Union Castle Steamship Co.,* 166 Fed. Rep. 251; *United*
*States* v. *American Tobacco Co.,* 164 Fed. Rep. 700; *Finck*
v. *Schneider Granite Co.,* 86 S. W. Rep. 221; *Ford* v. *Chi-*
*cago Milk Assn.,* 155 Illinois, 166.

The Standard Oil Company, through various defendant
subsidiary corporations is engaged in producing and pur-
chasing crude petroleum in Pennsylvania, West Virginia,
Ohio, Indiana, Illinois, Oklahoma, Kansas and California;
in transporting the same by pipe lines from the States in
which the same is produced into the various other States
to the manufactories of the various defendants; in manu-
facturing the same into the products of petroleum and
transporting those products, largely in the tank cars of
the Union Tank Line Company (controlled by the Stand-
ard Oil Company of New Jersey) to the various market-
ing places throughout the United States, and in selling
and disposing of the same.  This clearly makes the defend-
ants engaged in interstate commerce.  *Swift & Co.* v.

*United States*, 196 U. S. 375; *Shawnee Compress Co.* v. *Anderson*, 209 U. S. 423; *Loewe* v. *Lawlor*, 208 U. S. 274.

The amalgamation of the stocks of all these companies in 1899 in the Standard Oil Company of New Jersey as a holding corporation was a combination in restraint of trade within § 1 of the Sherman Act. *United States* v. *Northern Securities Co.*, 193 U. S. 197; *Harriman* v. *Northern Securities Co.*, 197 U. S. 244; *Shawnee Compress Co.* v. *Anderson*, 209 U. S. 423; *Swift & Co.* v. *United States*, 196 U. S. 375; *Loewe* v. *Lawlor*, 208 U. S. 274; *Continental Wall Paper Co.* v. *Voight*, 148 Fed. Rep. 939; 212 U. S. 227; *Burrows* v. *Inter. Met. Co.*, 156 Fed. Rep. 389; *Montague* v. *Lowry*, 193 U. S. 38; *Distilling & Cattle Feeding Co.* v. *People*, 156 Illinois, 48; *Harding* v. *Am. Glucose Co.*, 55 N. E. Rep. 577; *Dunbar* v. *American Tel. & Teleg. Co.*, 79 N. E. Rep. 427; *Missouri* v. *Standard Oil Co.*, 218 Missouri, 1; *Merchants' Ice & Cold Storage Co.* v. *Rohrman*, 128 S. W. Rep. 599; *State* v. *International Harvester Co.*, 79 Kansas, 371; *International Harvester Co.* v. *Commonwealth*, 124 Kentucky, 543; *State* v. *Creamery Package Mfg. Co.*, 126 N. W. Rep. 126.

The *Northern Securities Case* and other authorities cited under this head are conclusive of the proposition that this is a combination in restraint of trade. The court held that the inhibitions of the Sherman Act were not limited to those direct restraints upon trade and commerce evidenced by contracts between independent lines of railway to fix rates or to maintain rates, or manufacturing or other corporations to limit the supply or control prices; that the power of suppression of competition and therefore of restraint of trade exercised or which could be exercised by reason of stock ownership and control of the various corporations, was as much in violation of the Anti-trust Act as direct restraint by contract. There is nothing in the act which can be construed to prohibit the suppression of competition by reason of stock control of railways

and at the same time to permit it in manufacturing industries, pipe line companies, or car line companies engaged in the manufacture and transportation of oil. The contracts, combinations in the form of trusts or otherwise, or conspiracies in restraint of trade, which are inhibited by the first section of the act as applied to these classes of corporations cannot be distinguished from those contracts, combinations in the form of trusts or otherwise, or conspiracies in restraint of trade, when applied to railway companies. The thing inhibited is the restraint of interstate commerce. The thing to be accomplished is the maintenance of the freedom of trade. The inhibition against the suppression of competition by any instrumentality, scheme, plan or device, to evade the act, applies to all corporations and all devices. The real point is not the instrumentality or the scheme used to suppress the competition, but whether competition is thus suppressed and trade restrained and monopolized. Nowhere in the decisions of this court is there authority for the proposition that combinations by stock ownership or the purchase of competing properties is invalid as to railroads, but valid as to trading and manufacturing companies. The act of Congress and the decisions of this court, so far as the principle goes, places them upon the same plane. In the argument of the *Freight Association cases* it was urged by counsel that the inhibitions of the Sherman Act in this regard did not apply to railroads, but only included trading companies. It is now urged that they apply to railroads and do not apply to manufacturing and trading companies. But this court in the *Freight Association cases* clearly laid down the rule that while there are points of difference existing between the two classes of corporations, yet they are all engaged in interstate commerce, that the injuries to the public have many common features, and that the inhibitions apply to all. 166 U. S. 322.

The transfer of the stocks of these companies in 1899 to the Standard Oil Company of New Jersey had no greater legal sanctity than the transfer to the trustees in 1882, nor was it different from the transfer of the stocks of the Northern Pacific and Great Northern Railways to the Northern Securities Company in 1901, two years after the organization of the present corporate Standard Oil combination. It is the usual course of reasoning urged in all of these trust cases—because a person has a right to purchase property, he may therefore purchase a competitor, and because he may purchase one competitor he may purchase all of his competitors, and what an individual may do a corporation may do. These were the identical arguments pressed with great ability by counsel in the *Northern Securities Case* and in the subsequent case of *Harriman* v. *Northern Securities Co.,* 197 U. S. 291; but this court held to the contrary. The position is also contrary to the almost universal trend of the American decisions both Federal and state. The exercise of an individual right disconnected from all other circumstances may be legal, but when taken together with the other circumstances may accomplish the prohibited thing.

The second section of the act prohibits a person or a single corporation from monopolizing or attempting to monopolize any part of the commerce of the country by any means whatever, and also from conspiring with any other person or persons to accomplish the same object. The two sections of the act were manifestly not intended to cover the same thing; otherwise the second section would be useless. Any contract or combination in the form of a trust or otherwise, or conspiracy in restraint of trade which tends to monopoly is prohibited by the first section. *Addyston Pipe Case,* 175 U. S. 211; *United States* v. *Northern Securities Co.,* 193 U. S. 334.

The question then is: What is the meaning of the word "monopoly," as used in the second section of the act?

Of course Congress did not have in mind monopoly by legislative or executive grant. *National Cotton Oil Co.* v. *Texas,* 197 U. S. 129; *Burrows* v. *Inter. Met. Co.,* 156 Fed. Rep. 389, opinion by Judge Holt. Such monopolies could not exist in this country except by grant of Congress or the States, and it has been held that exclusive grants to pursue an ordinary legitimate business are void. *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 754. Neither did Congress have in mind an absolute monopoly. This can only be obtained by legislative grant. In a country like ours, where everyone is free to enter the field of industry, no absolute monopoly is probable. It is sufficient to bring it within the act if the combination or the aggregation of capital "tends to monopoly . . . or are reasonably calculated to bring about the things forbidden." *Waters-Pierce Co.* v. *Texas,* 212 U. S. 86. Originally monopoly meant a grant by sovereign power of the exclusive right to carry on any employment. The only act of exclusion was the grant itself. If the grant was void, then there was no monopoly. These monopolies were common in all monarchial countries. Monopoly, however, came to have a broader meaning under the common law in the later days, and especially in the United States, and in order to arrive at what Congress intended by the act of 1890 it is important to understand the history of the times and the general understanding of monopoly as defined by the courts and the political economists, and the monopolies which were known to the people generally and against which Congress was legislating. Prior to the passage of this law, the various trust cases had been decided, in which trusts, like the Standard Oil of 1882, had been held illegal because they tended to create a monopoly. *People* v. *North River Sugar Refining Co.,* 54 Hun, 354; *State* v. *Nebraska Distilling Co.,* 29 Nebraska, 700; *State* v. *Standard Oil Co.,* 49 Oh. St. 137. Various other decisions had defined monopoly as known

in this country,—such cases as *Alger* v. *Thacher*, 19 Pick.
51; *People* v. *Chicago Gas Trust*, 130 Illinois, 268; *Salt Co.*
v. *Guthrie*, 35 Oh. St. 666; *Craft* v. *McConoughy*, 79 Illinois, 346; *Central R. R. Co.* v. *Collins*, 40 Georgia, 582.

These cases were decided before the Sherman Act was
passed, and defined monopoly at common law as it was
understood and existed in this country. They embrace
trusts like the Standard Oil trust; agreements fixing prices,
dividing territory, or limiting production, thereby tending to enhance or control the price of products; general
agreements restraining individuals from engaging in any
employment except as incident to the sale of property;
purchases by corporations of all or a large proportion
of competing manufacturing or mechanical plants; combinations of separate businesses in the form of partnership
but really for the purpose of controlling the trade; and
various other forms of acquiring monopoly. There was no
unlawful exclusion of anyone else from doing business in
these cases. They show that the term "monopoly" as
applied in American jurisprudence meant monopoly acquired by mere individual acts, as distinguished from
grant of government, although the individual act in and
of itself was not illegal; the concentration of business in
the hands of one combination, corporation, or person, so
as to give control of the product or prices; as said by
Mr. Justice McKenna, in the *Cotton Oil Case*, "all suppression of competition, by unification of interest or
management."

The case of *Craft* v. *McConoughy*, *supra*, well illustrates
this argument. The pretended copartnership formed between the dealers of the town of Rochelle, while carrying on the business separately, enabled them to control
the prices to the detriment of the surrounding country.
It was therefore a monopolizing or an attempt to monopolize a part of the commerce of the State; and the monopolization would have been just as effective had these sepa-

rate business enterprises been stock corporations and the stock placed in the hands of a holding company. A similar illustration was the case of *Smiley* v. *Kansas*, 196 U. S. 447 (affirming 65 Kansas, 240), in which an attempt to control the grain trade of a particular station was held illegal under a state statute. The Standard combination is an attempt to control and monopolize a vast commerce of the entire country, as these people undertook to control and monopolize a local commerce.

The term "monopoly," therefore, as used in the Sherman Act was intended to cover such monopolies or attempts to monopolize as were known to exist in this country; those which were defined as illegal at common law by the States, when applied to intrastate commerce, and those which were known to Congress when the act was passed. The monopoly most commonly known in this country, and which the debates in Congress [1] show were intended to be prohibited by the act, were those acquired by combination (by purchase or otherwise) of competing concerns. The purchase of a competitor, as a separate transaction standing alone, was the exercise of a lawful privilege, not in and of itself unlawful at common law nor prohibited by statute, yet in the *Northern Securities Case* the purchase of stock in a railway was held to be illegal when done in pursuance of a scheme of monopoly.

It is not necessary in this case, and we doubt whether in any case it is possible, to make a comprehensive definition of monopoly which will cover every case that might arise. It is sufficient if the case at bar clearly comes within the provisions of the act. We believe that the defendants have acquired a monopoly by means of a combination of the principal manufacturing concerns through

---

[1] Cong. Rec., Vol. 21, part 3, pp. 2456–2460, 2562, 2645, 2726, 2728, 2791, 2928; Cong. Rec., Vol. 21, part 5, pp. 4089, 4093, 4098, 4101; Vol. 21, part 6, p. 5954.

a holding company; that they have, by reason of the very size of the combination, been able to maintain this monopoly through unfair methods of competition, discriminatory freight rates, and other means set forth in the proofs. If this act did not mean this kind of monopoly, we doubt if there is such a thing in this country. The men who framed the Constitution of this country were familiar with the history of monopolies growing out of acts of the Government. They guarded the people against these by constitutional provisions, but they left open the widest field for the exercise of individual enterprise, and it was the abuse of these personal privileges, made easy by state laws permitting unlimited incorporation, which gave rise to the evils that convinced the people of the necessity for the passage of the Sherman Anti-trust Act. It was not monopolies as known to the English common law, but monopolies such as were commonly understood to exist in this country which that act prohibited.

As a natural conclusion from the foregoing definition of monopoly by appellants' counsel they claim that the inhibitions of the second section are against the unlawful means used to acquire the monopoly, but that acquired monopoly is not illegal; therefore that the court can only restrain the means by which the monopoly was acquired, leaving the monopoly to exist. We believe this to be an altogether too refined construction of the act. If such be the true interpretation, the result would be that one could combine all the separate manufactures in a given branch of industry in this country by use of unlawful means such as discriminatory freight rates, but, if not attacked by the Government before it had obtained complete control of the business, its very size, with its ramifications through all the States, would make it impossible for anyone else to compete, and it could control the price of products in the entire country and would be beyond the reach of the law. It could, by selling at a low price where a competitor was

engaged in business and by raising the price where there was no attempt at competition, absolutely control the business without itself suffering any loss; and yet the Government would be powerless to destroy the monopoly because the unlawful means had been abandoned.

If the court finds this combination to be in restraint of trade and a monopoly, it is authorized by § 3 to enjoin the same and has plenary power to make such decree as is necessary to enforce the terms and provisions of the act. *Northern Securities Co.* v. *United States,* 193 U. S. 336, 337, 344; *Swift & Co.* v. *United States,* 196 U. S. 375; *United States* v. *Marigold,* 9 How. 560, 566; *Crutcher* v. *Kentucky,* 141 U. S. 57; *In re Rapier,* 143 U. S. 110; *The Lottery Case,* 188 U. S. 321; *United States* v. *General Paper Co.,* opinion of Judge Sanborn in settling the decree, not reported; *United States* v. *American Tobacco Co.,* 164 Fed. Rep. 700; *Chicago, Rock Island & Pacific R. R. Co.* v. *Union Pacific R. R. Co.,* 47 Fed. Rep. 15, 26.

Evidence that the defendant companies obtained rebates and discriminatory rates in the transportation of their product as against their competitors, and engaged in unfair and oppressive methods of competition thereby destroying the smaller manufacturers and dealers throughout the country, is material in this case. *State of Missouri* v. *Standard Oil Co.,* 218 Missouri, 1; *State of Minnesota* v. *Standard Oil Co.,* 126 N. W. Rep. 527; *Standard Oil Co.* v. *State of Tennessee,* 117 Tennessee, 618; *S. C.,* 120 Tennessee, 86; *S. C.,* 217 U. S. 413; *State of South Dakota* v. *Central Lumber Co.,* 123 N. W. Rep. 504; *Citizens' Light, Heat & Power Co.* v. *Montgomery,* 171 Fed. Rep. 553; *State of Nebraska* v. *Drayton,* 82 Nebraska, 254; *S. C.,* 117 N. W. Rep. 769; *People* v. *American Ice Co.,* 120 N. Y. Supp. 443.

A person or corporation joining a conspiracy after it is formed, and thereafter aiding in its execution, becomes from that time as much a conspirator as if he originally designed and put it into operation. *United States* v.

*Standard Oil Co.*, 152 Fed. Rep. 294; *Lincoln* v. *Claflin*, 7 Wall. 132; *United States* v. *Babcock*, 24 Fed. Cas. 915, No. 14,487; *United States* v. *Cassidy*, 67 Fed. Rep. 698, 702; *The Anarchist Case*, 122 Illinois, 1; *United States* v. *Johnson*, 26 Fed. Rep. 682, 684; *People* v. *Mather*, 4 Wend. 230.

This conspiracy was a continuing offense. Every overt act committed in furtherance thereof was a renewal of the same as to all of the parties. The statute of limitations does not begin to run until the commission of the last overt act. Neither can the parties claim a vested right to violate the law. 19 Am. & Eng. Ency. of Law, 2d ed, "Limitations of Actions;" *United States* v. *Greene*, 115 Fed. Rep. 343; *Ochs* v. *People*, 124 Illinois, 399; *Spies* v. *People*, 122 Illinois, 1; 8 Cyc. 678; *State* v. *Pippin*, 88 N. Car. 646; *United States* v. *Bradford*, 148 Fed. Rep. 413; *Commonwealth* v. *Bartilson*, 85 Pa. St. 489; *People* v. *Mather*, 4 Wend. 261; *State* v. *Kemp*, 87 No. Car. 538; *American Fire Ins. Co.* v. *State*, 22 So. Rep. (Miss.) 99; *Lorenz* v. *United States*, 24 App. D. C. 337; *People* v. *Willis*, 23 Misc. (N. Y.) 568; *Raleigh* v. *Cook*, 60 Texas, 438; *Commonwealth* v. *Gillespie*, 10 Am. Dec. (Pa.) 480.

Mr. Chief Justice White delivered the opinion of the court.

The Standard Oil Company of New Jersey and 33 other corporations, John D. Rockefeller, William Rockefeller and five other individual defendants prosecute this appeal to reverse a decree of the court below. Such decree was entered upon a bill filed by the United States under authority of § 4, of the act of July 2, 1890, c. 647, p. 209, known as the Anti-trust Act, and had for its object the enforcement of the provisions of that act. The record is inordinately voluminous, consisting of twenty-three volumes of printed matter, aggregating about twelve thousand pages, containing a vast amount of confusing and conflicting testi-

mony relating to innumerable, complex and varied business transactions, extending over a period of nearly forty years. In an effort to pave the way to reach the subjects which we are called upon to consider, we propose at the outset, following the order of the bill, to give the merest possible outline of its contents, to summarize the answer, to indicate the course of the trial, and point out briefly the decision below rendered.

The bill and exhibits, covering one hundred and seventy pages of the printed record, was filed on November 15, 1906. Corporations known as Standard Oil Company of New Jersey, Standard Oil Company of California, Standard Oil Company of Indiana, Standard Oil Company of Iowa, Standard Oil Company of Kansas, Standard Oil Company of Kentucky, Standard Oil Company of Nebraska, Standard Oil Company of New York, Standard Oil Company of Ohio and sixty-two other corporations and partnerships, as also seven individuals were named as defendants. The bill was divided into thirty numbered sections, and sought relief upon the theory that the various defendants were engaged in conspiring "to restrain the trade and commerce in petroleum, commonly called 'crude oil,' in refined oil, and in the other products of petroleum, among the several States and Territories of the United States and the District of Columbia and with foreign nations, and to monopolize the said commerce." The conspiracy was alleged to have been formed in or about the year 1870 by three of the individual defendants, viz: John D. Rockefeller, William Rockefeller and Henry M. Flagler. The detailed averments concerning the alleged conspiracy were arranged with reference to three periods, the first from 1870 to 1882, the second from 1882 to 1899, and the third from 1899 to the time of the filing of the bill.

The general charge concerning the period from 1870 to 1882 was as follows:

"That during said first period the said individual defendants, in connection with the Standard Oil Company of Ohio, purchased and obtained interests through stock ownership and otherwise in, and entered into agreements with, various persons, firms, corporations, and limited partnerships engaged in purchasing, shipping, refining, and selling petroleum and its products among the various States for the purpose of fixing the price of crude and refined oil and the products thereof, limiting the production thereof, and controlling the transportation therein, and thereby restraining trade and commerce among the several States, and monopolizing the said commerce."

To establish this charge it was averred that John D. and William Rockefeller and several other named individuals, who, prior to 1870, composed three separate partnerships engaged in the business of refining crude oil and shipping its products in interstate commerce, organized in the year 1870, a corporation known as the Standard Oil Company of Ohio and transferred to that company the business of the said partnerships, the members thereof becoming, in proportion to their prior ownership, stockholders in the corporation. It was averred that the other individual defendants soon afterwards became participants in the illegal combination and either transferred property to the corporation or to individuals to be held for the benefit of all parties in interest in proportion to their respective interests in the combination; that is, in proportion to their stock ownership in the Standard Oil Company of Ohio. By the means thus stated, it was charged that by the year 1872, the combination had acquired substantially all but three or four of the thirty-five or forty oil refineries located in Cleveland, Ohio. By reason of the power thus obtained and in further execution of the intent and purpose to restrain trade and to monopolize the commerce, interstate as well as intrastate, in petroleum and its products, the bill alleged that the combination and its mem-

bers obtained large preferential rates and rebates in many and devious ways over their competitors from various railroad companies, and that by means of the advantage thus obtained many, if not virtually all, competitors were forced either to become members of the combination or were driven out of business; and thus, it was alleged, during the period in question the following results were brought about: *a.* That the combination, in addition to the refineries in Cleveland which it had acquired as previously stated, and which it had either dismantled to limit production or continued to operate, also from time to time acquired a large number of refineries of crude petroleum, situated in New York, Pennsylvania, Ohio and elsewhere. The properties thus acquired, like those previously obtained, although belonging to and being held for the benefit of the combination, were ostensibly divergently controlled, some of them being put in the name of the Standard Oil Company of Ohio, some in the name of corporations or limited partnerships affiliated therewith, or some being left in the name of the original owners who had become stockholders in the Standard Oil Company of Ohio and thus members of the alleged illegal combination. *b.* That the combination had obtained control of the pipe lines available for transporting oil from the oil fields to the refineries in Cleveland, Pittsburg, Titusville, Philadelphia, New York and New Jersey. *c.* That the combination during the period named had obtained a complete mastery over the oil industry, controlling 90 per cent of the business of producing, shipping, refining and selling petroleum and its products, and thus was able to fix the price of crude and refined petroleum and to restrain and monopolize all interstate commerce in those products.

The averments bearing upon the second period (1882 to 1899) had relation to the claim:

"That during the said second period of conspiracy the defendants entered into a contract and trust agreement,

by which various independent firms, corporations, limited
partnerships and individuals engaged in purchasing, trans-
porting, refining, shipping and selling oil and the products
thereof among the various States turned over the manage-
ment of their said business, corporations and limited part-
nerships to nine trustees, composed chiefly of certain indi-
viduals defendant herein, which said trust agreement was
in restraint of trade and commerce and in violation of law,
as hereinafter more particularly alleged."

The trust agreement thus referred to was set out in the
bill. It was made in January, 1882. By its terms the
stock of forty corporations, including the Standard Oil
Company of Ohio, and a large quantity of various proper-
ties which had been previously acquired by the alleged
combination and which was held in diverse forms, as we
have previously indicated, for the benefit of the members
of the combination, was vested in the trustees and their
successors, "to be held for all parties in interest jointly."
In the body of the trust agreement was contained a list of
the various individuals and corporations and limited part-
nerships whose stockholders and members, or a portion
thereof, became parties to the agreement. This list is in
the margin.[1]

---

[1] 1st. All the stockholders and members of the following corpora-
tions and limited partnerships, to wit:

Acme Oil Company, New York.

Acme Oil Company, Pennsylvania.

Atlantic Refining Company of Philadelphia.

Bush & Co. (Limited).

Camden Consolidated Oil Company.

Elizabethport Acid Works.

Imperial Refining Company (Limited).

Charles Pratt & Co.

Paine, Ablett & Co.

Standard Oil Company, Ohio.

Standard Oil Company, Pittsburg.

Smith's Ferry Oil Transportation Company.

Solar Oil Company (Limited).

The agreement made provision for the method of controlling and managing the property by the trustees, for the formation of additional manufacturing, etc., corpora-

Sone & Fleming Manufacturing Company (Limited).

Also all the stockholders and members of such other corporations and limited partnerships as may hereafter join in this agreement at the request of the trustees herein provided for.

2d. The following individuals, to wit:

W. C. Andrews, John D. Archbold, Lide K. Arter, J. A. Bostwick, Benjamin Brewster, D. Bushnell, Thomas C. Bushnell, J. N. Camden, Henry L. Davis, H. M. Flagler, Mrs. H. M. Flagler, John Huntington, H. A. Hutchins, Charles F. G. Heye, A. B. Jennings, Charles Lockhart, A. M. McGregor, William H. Macy, William H. Macy, jr., estate of Josiah Macy, William H. Macy, jr., executor; O. H. Payne, A. J. Pouch, John D. Rockefeller, William Rockefeller, Henry H. Rogers, W. P. Thompson, J. J. Vandergrift, William T. Wardwell, W. G. Warden, Joseph L. Warden, Warden, Frew & Co., Louise C. Wheaton, H. M. Hanna, and George W. Chapin, D. M. Harkness, D. M. Harkness, trustee, S. V. Harkness, O. H. Payne, trustee; Charles Pratt, Horace A. Pratt, C. M. Pratt, Julia H. York, George H. Vilas, M. R. Keith, trustees, George F. Chester.

Also all such individuals as may hereafter join in the agreement at the request of the trustees herein provided for.

3d. A portion of the stockholders and members of the following corporations and limited partnerships, to wit:

American Lubricating Oil Company.

Baltimore United Oil Company.

Beacon Oil Company.

Bush & Denslow Manufacturing Company.

Central Refining Co. of Pittsburg.

Chesebrough Manufacturing Company.

Chess Carley Company.

Consolidated Tank Line Company.

Inland Oil Company.

Keystone Refining Company.

Maverick Oil Company.

National Transit Company.

Portland Kerosene Oil Company.

Producers' Consolidated Land and Petroleum Company.

Signal Oil Works (Limited).

Thompson & Bedford Company (Limited).

tions in various States, and the trust, unless terminated by a mode specified, was to continue "during the lives of the survivors and survivor of the trustees named in the agreement and for twenty-one years thereafter." The agreement provided for the issue of Standard Oil Trust certificates to represent the interest arising under the trust in the properties affected by the trust, which of course in view of the provisions of the agreement and the subject to which it related caused the interest in the certificates to be coincident with and the exact representative of the interest in the combination, that is, in the Standard Oil Company of Ohio. Soon afterwards it was alleged the trustees organized the Standard Oil Company of New Jersey and the Standard Oil Company of New York, the former having a capital stock of $3,000,000 and the latter a capital stock of $5,000,000, subsequently increased to $10,000,000 and $15,000,000 respectively. The bill alleged "that pursuant to said trust agreement the said trustees caused to be transferred to themselves the stocks of all corporations and limited partnerships named in said trust agreement, and caused various of the individuals and copartnerships, who owned apparently independent refineries and other properties employed in the business of refining and transporting and selling oil in and among said various States and Terri-

---

Devoe Manufacturing Company.
Eclipse Lubricating Oil Company (Limited).
Empire Refining Company (Limited).
Franklin Pipe Company (Limited).
Galena Oil Works (Limited).
Galena Farm Oil Company (Limited).
Germania Mining Company.
Vacuum Oil Company.
H. C. Van Tine & Company (Limited).
Waters-Pierce Oil Company.
Also stockholders and members (not being all thereof) of other corporations and limited partnerships who may hereafter join in this agreement at the request of the trustees herein provided for."

tories of the United States as aforesaid, to transfer their property situated in said several States to the respective Standard Oil Companies of said States of New York, New Jersey, Pennsylvania and Ohio, and other corporations organized or acquired by said trustees from time to time. . . ." For the stocks and property so acquired the trustees issued trust certificates. It was alleged that in 1888 the trustees "unlawfully controlled the stock and ownership of various corporations and limited partnerships engaged in such purchase and transportation, refining, selling, and shipping of oil," as per a list which is excerpted in the margin.[1]

---

[1] *List of Corporations the Stocks of Which Were Wholly or Partially Held by the Trustees of Standard Oil Trust,*

|  | Capital Stock. | S. O. trust ownership. |
|---|---|---|
| New York State: |  |  |
| Acme Oil Company, manufacturers of petroleum products. | $300,000 | Entire. |
| Atlas Refining Company, manufacturers of petroleum products. | 200,000 | Do. |
| American Wick Manufacturing Company, manufacturers of lamp wicks. | 25,000 | Do. |
| Bush & Denslow Manufacturing Company, manufacturers of petroleum products. | 300,000 | 50 per cent. |
| Chesebrough Manufacturing Company, manufacturers of petroleum. | 500,000 | 2,661–5,000 |
| Central Refining Company (Limited), manufacturers of petroleum products. | 200,000 | 1–67.2 per ct. |
| Devoe Manufacturing Company, packers, manufacturers of petroleum. | 300,000 | Entire. |
| Empire Refining Company (Limited), manufacturers of petroleum products. | 100,000 | 80 per cent. |

The bill charged that during the second period quo war-
ranto proceedings were commenced against the Standard
Oil Company of Ohio, which resulted in the entry by the
Supreme Court of Ohio, on March 2, 1892, of a decree

|  | Capital Stock. | S. O. trust ownership. |
|---|---|---|
| New York State (*cont.*): |  |  |
| Oswego Manufacturing Company, manufacturers of wood cases. | 100,000 | Entire. |
| Pratt Manufacturing Company, manufacturers of petroleum products. | 500,000 | Do. |
| Standard Oil Company of New York, manufacturers of petroleum products. | 5,000,000 | Do. |
| Sone & Fleming Manufacturing Company (Limited), manufacturers of petroleum products. | 250,000 | Do. |
| Thompson & Bedford Company (Limited), manufacturers of petroleum products. | 250,000 | 80 per cent. |
| Vacuum Oil Company, manufacturers of petroleum products. | 25,000 | 75 per cent. |
| New Jersey: |  |  |
| Eagle Oil Company, manufacturers of petroleum products. | 350,000 | Entire. |
| McKirgan Oil Company, jobbers of petroleum products. | 75,000 | Do. |
| Standard Oil Company of New Jersey, manufacturers of petroleum products. | 3,000,000 | Do. |
| Pennsylvania: |  |  |
| Acme Oil Company, manufacturers of petroleum products. | 300,000 | Do. |
| Atlantic Refining Company, manufacturers of petroleum products. | 400,000 | Do. |
| Galena Oil Works (Limited), manufacturers of petroleum products. | 150,000 | $86\frac{1}{4}$ per cent. |
| Imperial Refining Company (Limited), manufacturers of petroleum products. | 300,000 | Entire. |

adjudging the trust agreement to be void, not only be-
cause the Standard Oil Company of Ohio was a party to
the same, but also because the agreement in and of itself

| | Capital Stock. | S. O. trust ownership. |
|---|---|---|
| Pennsylvania (*cont.*): | | |
| Producers' Consolidated Land and Petroleum Company, producers of crude oil. | 1,000,000 | $1\frac{65}{132}$ per cent. |
| National Transit Company, transporters of crude oil. | 25,455,200 | 94 per cent. |
| Standard Oil Company, manufacturers of petroleum products. | 400,000 | Entire. |
| Signal Oil Works (Limited), manufacturers of petroleum products. | 100,000 | 38¾ per cent. |
| Ohio: | | |
| Consolidated Tank-Line Company, jobbers of petroleum products. | 1,000,000 | 57 per cent. |
| Inland Oil Company, jobbers of petroleum products. | 50,000 | 50 per cent. |
| Standard Oil Company, manufacturers of petroleum products. | 3,500,000 | Entire. |
| Solar Refining Company, manufacturers of petroleum products. | 500,000 | Do. |
| Kentucky: | | |
| Standard Oil Company, jobbers of petroleum products. | 600,000 | Do. |
| Maryland: | | |
| Baltimore United Oil Company, manufacturers of petroleum products. | 600,000 | 5,059–6,000 |
| West Virginia: | | |
| Camden Consolidated Oil Company, manufacturers of petroleum products. | 200,000 | 51 per cent. |
| Minnesota: | | |
| Standard Oil Company, jobbers of petroleum products. | 100,000 | Entire. |
| Missouri: | | |
| Waters-Pierce Oil Company, jobbers of petroleum products. | 400,000 | 50 per cent. |

was in restraint of trade and amounted to the creation of an
unlawful monopoly. It was alleged that shortly after this
decision, seemingly for the purpose of complying therewith,
voluntary proceedings were had apparently to dissolve
the trust, but that these proceedings were a subterfuge
and a sham because they simply amounted to a transfer
of the stock held by the trust in 64 of the companies
which it controlled to some of the remaining 20 companies,
it having controlled before the decree 84 in all, thereby,
while seemingly in part giving up its dominion, yet in real-
ity preserving the same by means of the control of the
companies as to which it had retained complete authority.
It was charged that especially was this the case, as the
stock in the companies selected for transfer was virtually
owned by the nine trustees or the members of their imme-
diate families or associates.   The bill further alleged that in
1897 the Attorney-General of Ohio instituted contempt
proceedings in the quo warranto case based upon the claim
that the trust had not been dissolved as required by the
decree in that case.  About the same time also proceedings
in quo warranto were commenced to forfeit the charter of
a pipe line known as the Buckeye Pipe Line Company, an

|  | Capital Stock. | S. O. trust ownership. |
|---|---|---|
| Massachusetts: |  |  |
| Beacon Oil Company, jobbers of petroleum products. | 100,000 | Entire. |
| Maverick Oil Company, jobbers of petroleum products. | 100,000 | Do. |
| Maine: |  |  |
| Portland Kerosene Oil Company, jobbers of petroleum products. | 200,000 | Do. |
| Iowa: |  |  |
| Standard Oil Company, jobbers of petroleum products. | 600,000 | 60 per cent. |
| Continental Oil Company, jobbers of petroleum products. | 300,000 | 62½ per cent. |

Ohio corporation, whose stock, it was alleged, was owned by the members of the combination, on the ground of its connection with the trust which had been held to be illegal.

The result of these proceedings, the bill charged, caused a resort to the alleged wrongful acts asserted to have been committed during the third period, as follows:

"That during the third period of said conspiracy and in pursuance thereof the said individual defendants operated through the Standard Oil Company of New Jersey, as a holding corporation, which corporation obtained and acquired the majority of the stocks of the various corporations engaged in purchasing, transporting, refining, shipping, and selling oil into and among the various States and Territories of the United States and the District of Columbia and with foreign nations, and thereby managed and controlled the same, in violation of the laws of the United States, as hereinafter more particularly alleged."

It was alleged that in or about the month of January, 1899, the individual defendants caused the charter of the Standard Oil Company of New Jersey to be amended; "so that the business and objects of said company were stated as follows, to wit: 'To do all kinds of mining, manufacturing, and trading business; transporting goods and merchandise by land or water in any manner; to buy, sell, lease, and improve land; build houses, structures, vessels, cars, wharves, docks, and piers; to lay and operate pipe lines; to erect lines for conducting electricity; to enter into and carry out contracts of every kind pertaining to its business; to acquire, use, sell, and grant licenses under patent rights; to purchase or otherwise acquire, hold, sell, assign, and transfer shares of capital stock and bonds or other evidences of indebtedness of corporations, and to exercise all the privileges of ownership, including voting upon the stock so held; to carry on its business and have offices and agencies therefor in all parts of the world, and

to hold, purchase, mortgage, and convey real estate and personal property outside the State of New Jersey.'"

The capital stock of the company—which since March 19, 1892, had been $10,000,000—was increased to $110,000,000; and the individual defendants, as theretofore, continued to be a majority of the board of directors.

Without going into detail it suffices to say that it was alleged in the bill that shortly after these proceedings the trust came to an end, the stock of the various corporations which had been controlled by it being transferred by its holders to the Standard Oil Company of New Jersey, which corporation issued therefor certificates of its common stock to the amount of $97,250,000. The bill contained allegations referring to the development of new oil fields, for example, in California, southeastern Kansas, northern Indian Territory, and northern Oklahoma, and made reference to the building or otherwise acquiring by the combination of refineries and pipe lines in the new fields for the purpose of restraining and monopolizing the interstate trade in petroleum and its products.

Reiterating in substance the averments that both the Standard Oil Trust from 1882 to 1899 and the Standard Oil Company of New Jersey since 1899 had monopolized and restrained interstate commerce in petroleum and its products, the bill at great length additionally set forth various means by which during the second and third periods, in addition to the effect occasioned by the combination of alleged previously independent concerns, the monopoly and restraint complained of was continued. Without attempting to follow the elaborate averments on these subjects spread over fifty-seven pages of the printed record, it suffices to say that such averments may properly be grouped under the following heads: Rebates, preferences and other discriminatory practises in favor of the combination by railroad companies; restraint and monopolization by control of pipe lines, and unfair practises against com-

peting pipe lines; contracts with competitors in restraint of trade; unfair methods of competition, such as local price cutting at the points where necessary to suppress competition; espionage of the business of competitors, the operation of bogus independent companies, and payment of rebates on oil, with the like intent; the division of the United States into districts and the limiting of the operations of the various subsidiary corporations as to such districts so that competition in the sale of petroleum products between such corporations had been entirely eliminated and destroyed; and finally reference was made to what was alleged to be the "enormous and unreasonable profits" earned by the Standard Oil Trust and the Standard Oil Company as a result of the alleged monopoly; which presumably was averred as a means of reflexly inferring the scope and power acquired by the alleged combination.

Coming to the prayer of the bill, it suffices to say that in general terms the substantial relief asked was, first, that the combination in restraint of interstate trade and commerce and which had monopolized the same, as alleged in the bill, be found to have existence and that the parties thereto be perpetually enjoined from doing any further act to give effect to it; second, that the transfer of the stocks of the various corporations to the Standard Oil Company of New Jersey, as alleged in the bill, be held to be in violation of the first and second sections of the Antitrust Act, and that the Standard Oil Company of New Jersey be enjoined and restrained from in any manner continuing to exert control over the subsidiary corporations by means of ownership of said stock or otherwise; third, that specific relief by injunction be awarded against further violation of the statute by any of the acts specifically complained of in the bill. There was also a prayer for general relief.

Of the numerous defendants named in the bill, the Waters-Pierce Oil Company was the only resident of the

district in which the suit was commenced and the only defendant served with process therein. Contemporaneous with the filing of the bill the court made an order, under § 5 of the Anti-trust Act, for the service of process upon all the other defendants, wherever they could be found. Thereafter the various defendants unsuccessfully moved to vacate the order for service on non-resident defendants or filed pleas to the jurisdiction. Joint exceptions were likewise unsuccessfully filed, upon the ground of impertinence, to many of the averments of the bill of complaint, particularly those which related to acts alleged to have been done by the combination prior to the passage of the Anti-trust Act and prior to the year 1899.

Certain of the defendants filed separate answers, and a joint answer was filed on behalf of the Standard Oil Company of New Jersey and numerous of the other defendants. The scope of the answers will be adequately indicated by quoting a summary on the subject made in the brief for the appellants.

"It is sufficient to say that, whilst admitting many of the alleged acquisitions of property, the formation of the so-called trust of 1882, its dissolution in 1892, and the acquisition by the Standard Oil Company of New Jersey of the stocks of the various corporations in 1899, they deny all the allegations respecting combinations or conspiracies to restrain or monopolize the oil trade; and particularly that the so-called trust of 1882, or the acquisition of the shares of the defendant companies by the Standard Oil Company of New Jersey in 1899, was a combination of *independent or competing* concerns or corporations. The averments of the petition respecting the means adopted to monopolize the oil trade are traversed either by a denial of the acts alleged or of their purpose, intent or effect."

On June 24, 1907, the cause being at issue, a special examiner was appointed to take the evidence, and his report was filed March 22, 1909. It was heard on April 5

to 10, 1909, under the expediting act of February 11, 1903, before a Circuit Court consisting of four judges.

The court decided in favor of the United States. In the opinion delivered, all the multitude of acts of wrongdoing charged in the bill were put aside, in so far as they were alleged to have been committed prior to the passage of the Anti-trust Act, "except as evidence of their (the defendants') purpose, of their continuing conduct and of its effect." (173 Fed. Rep. 177.)

By the decree which was entered it was adjudged that the combining of the stocks of various companies in the hands of the Standard Oil Company of New Jersey in 1899 constituted a combination in restraint of trade and also an attempt to monopolize and a monopolization under § 2 of the Anti-trust Act. The decree was against seven individual defendants, the Standard Oil Company of New Jersey, thirty-six domestic companies and one foreign company which the Standard Oil Company of New Jersey controls by stock ownership; these 38 corporate defendants being held to be parties to the combination found to exist.[1]

The bill was dismissed as to all other corporate defendants, 33 in number, it being adjudged by § 3 of the decree that they "have not been proved to be engaged in the operation or carrying out of the combination."[2]

---

[1] Counsel for appellants says: "Of the 38 (37) corporate defendants named in section 2 of the decree and as to which the judgment of the court applies, four have not appealed, to wit: Corsicana Refining Co., Manhattan Oil Co., Security Oil Co., Waters-Pierce Oil Co., and one, the Standard Oil Co. of Iowa, has been liquidated and no longer exists."

[2] Of the dismissed defendants 16 were natural gas companies and 10 were companies which were liquidated and ceased to exist before the filing of the petition. The other dismissed defendants, 7 in number, were: Florence Oil Refining Co., United Oil Co., Tidewater Oil Co., Tide Water Pipe Co. (L't'd), Platt & Washburn Refining Co., Franklin Pipe Co. and Pennsylvania Oil Co.

The Standard Oil Company of New Jersey was enjoined from voting the stocks or exerting any control over the said 37 subsidiary companies, and the subsidiary companies were enjoined from paying any dividends as to the Standard Oil Company or permitting it to exercise any control over them by virtue of the stock ownership or power acquired by means of the combination. The individuals and corporations were also enjoined from entering into or carrying into effect any like combination which would evade the decree. Further, the individual defendants, the Standard Oil Company, and the 37 subsidiary corporations were enjoined from engaging or continuing in interstate commerce in petroleum or its products during the continuance of the illegal combination.

At the outset a question of jurisdiction requires consideration, and we shall, also, as a preliminary, dispose of another question, to the end that our attention may be completely concentrated upon the merits of the controversy when we come to consider them.

First. We are of opinion that in consequence of the presence within the district of the Waters-Pierce Oil Company, the court, under the authority of § 5 of the Anti-trust Act, rightly took jurisdiction over the cause and properly ordered notice to be served upon the non-resident defendants.

Second. The overruling of the exceptions taken to so much of the bill as counted upon facts occurring prior to the passage of the Anti-trust Act,—whatever may be the view as an original question of the duty to restrict the controversy to a much narrower area than that propounded by the bill,—we think by no possibility in the present stage of the case can the action of the court be treated as prejudicial error justifying reversal. We say this because the court, as we shall do, gave no weight to the testimony adduced under the averments complained of except in so far as it tended to throw light upon the acts done after the

passage of the Anti-trust Act and the results of which it was charged were being participated in and enjoyed by the alleged combination at the time of the filing of the bill.

We are thus brought face to face with the merits of the controversy.

Both as to the law and as to the facts the opposing contentions pressed in the argument are numerous and in all their aspects are so irreconcilable that it is difficult to reduce them to some fundamental generalization, which by being disposed of would decide them all. For instance, as to the law. While both sides agree that the determination of the controversy rests upon the correct construction and application of the first and second sections of the Anti-trust Act, yet the views as to the meaning of the act are as wide apart as the poles, since there is no real point of agreement on any view of the act. And this also is the case as to the scope and effect of authorities relied upon, even although in some instances one and the same authority is asserted to be controlling.

So also is it as to the facts. Thus, on the one hand, with relentless pertinacity and minuteness of analysis, it is insisted that the facts establish that the assailed combination took its birth in a purpose to unlawfully acquire wealth by oppressing the public and destroying the just rights of others, and that its entire career exemplifies an inexorable carrying out of such wrongful intents, since, it is asserted, the pathway of the combination from the beginning to the time of the filing of the bill is marked with constant proofs of wrong inflicted upon the public and is strewn with the wrecks resulting from crushing out, without regard to law, the individual rights of others. Indeed, so conclusive, it is urged, is the proof on these subjects that it is asserted that the existence of the principal corporate defendant—the Standard Oil Company of New Jersey—with the vast accumulation of property which it owns or controls, because of its infinite potency

for harm and the dangerous example which its continued existence affords, is an open and enduring menace to all freedom of trade and is a byword and reproach to modern . economic methods. On the other hand, in a powerful analysis of the facts, it is insisted that they demonstrate that the origin and development of the vast business which the defendants control was but the result of lawful competitive methods, guided by economic genius of the highest order, sustained by courage, by a keen insight into commercial situations, resulting in the acquisition of great wealth, but at the same time serving to stimulate and increase production, to widely extend the distribution of the products of petroleum at a cost largely below that which would have otherwise prevailed, thus proving to be at one and the same time a benefaction to the general public as well as of enormous advantage to individuals. It is not denied that in the enormous volume of proof contained in the record in the period of almost a lifetime to . which that proof is addressed, there may be found acts of wrongdoing, but the insistence is that they were rather the exception than the rule, and in most cases were either the result of too great individual zeal in the keen rivalries of business or of the methods and habits of dealing which, even if wrong, were commonly practised at the time. And to discover and state the truth concerning these contentions both arguments call for the analysis and weighing, as we have said at the outset, of a jungle of conflicting testimony covering a period of forty years, a duty difficult to rightly perform and, even if satisfactorily accomplished, almost impossible to state with any reasonable regard to brevity.

Duly appreciating the situation just stated, it is certain that only one point of concord between the parties is discernable, which is, that the controversy in every aspect is controlled by a correct conception of the meaning of the first and second sections of the Anti-trust Act. We shall

therefore—departing from what otherwise would be the natural order of analysis—make this one point of harmony the initial basis of our examination of the contentions, relying upon the conception that by doing so some harmonious resonance may result adequate to dominate and control the discord with which the case abounds. That is to say, we shall first come to consider the meaning of the first and second sections of the Anti-trust Act by the text; and after discerning what by that process appears to be its true meaning we shall proceed to consider the respective contentions of the parties concerning the act, the strength or weakness of those contentions, as well as the accuracy of the meaning of the act as deduced from the text in the light of the prior decisions of this court concerning it. When we have done this we shall then approach the facts. Following this course we shall make our investigation under four separate headings: First. The text of the first and second sections of the act originally considered and its meaning in the light of the common law and the law of this country at the time of its adoption. Second. The contentions of the parties concerning the act, and the scope and effect of the decisions of this court upon which they rely. Third. The application of the statute to facts, and, Fourth. The remedy, if any, to be afforded as the result of such application.

*First. The text of the act and its meaning.*

We quote the text of the first and second sections of the act, as follows:

"SECTION 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce, among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract; or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by

imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"SEC. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The debates show that doubt as to whether there was a common law of the United States which governed the subject in the absence of legislation was among the influences leading to the passage of the act. They conclusively show, however, that the main cause which led to the legislation was the thought that it was required by the economic condition of the times, that is, the vast accumulation of wealth in the hands of corporations and individuals, the enormous development of corporate organization, the facility for combination which such organizations afforded, the fact that the facility was being used, and that combinations known as trusts were being multiplied, and the widespread impression that their power had been and would be exerted to oppress individuals and injure the public generally. Although debates may not be used as a means for interpreting a statute (*United States* v. *Trans-Missouri Freight Association*, 166 U. S. 318, and cases cited) that rule in the nature of things is not violated by resorting to, debates as a means of ascertaining the environment at the time of the enactment of a particular law, that is, the history of the period when it was adopted.

There can be no doubt that the sole subject with which the first section deals is restraint of trade as therein contemplated, and that the attempt to monopolize and monopolization is the subject with which the second sec-

tion is concerned. It is certain that those terms, at least in their rudimentary meaning, took their origin in the common law, and were also familiar in the law of this country prior to and at the time of the adoption of the act in question.

We shall endeavor then; first to seek their meaning, not by indulging in an elaborate and learned analysis of the English law and of the law of this country, but by making a very brief reference to the elementary and indisputable conceptions of both the English and American law on the subject prior to the passage of the Anti-trust Act.

*a.* It is certain that at a very remote period the words " contract in restraint of trade " in England came to refer to some voluntary restraint put by contract by an individual on his right to carry on his trade or calling. Originally all such contracts were considered to be illegal, because it was deemed they were injurious to the public as well as to the individuals who made them. In the interest of the freedom of individuals to contract this doctrine was modified so that it was only when a restraint by contract was so general as to be coterminous with the kingdom that it was treated as void. That is to say, if the restraint was partial in its operation and was otherwise reasonable the contract was held to be valid:

*b.* Monopolies were defined by Lord Coke as follows:

" 'A monopoly is an institution, or allowance by the king by his grant, commission, or otherwise to any person or persons, bodies politic or corporate, of or for the sole buying, selling, making, working, or using of anything, whereby any person or persons, bodies politic or corporate, are sought to be restrained of any freedom or liberty that they had before, or hindered in their lawful trade.' (3 Inst. 181, c. 85.) "

Hawkins thus defined them:

" 'A monopoly is an allowance by the king to a particular person or persons of the sole buying, selling, making,

working, or using of anything whereby the subject in general is restrained from the freedom of manufacturing or trading which he had before.' (Hawk. P. C. bk. 1, c. 29.)"

The frequent granting of monopolies and the struggle which led to a denial of the power to create them, that is to say, to the establishment that they were incompatible with the English constitution is known to all and need not be reviewed. The evils which led to the public outcry against monopolies and to the final denial of the power to make them may be thus summarily stated: 1. The power which the monopoly gave to the one who enjoyed it to fix the price and thereby injure the public; 2. The power which it engendered of enabling a limitation on production; and, 3. The danger of deterioration in quality of the monopolized article which it was deemed was the inevitable resultant of the monopolistic control over its production and sale. As monopoly as thus conceived embraced only a consequence arising from an exertion of sovereign power, no express restrictions or prohibitions obtained against the creation by an individual of a monopoly as such. But as it was considered, at least so far as the necessaries of life were concerned, that individuals by the abuse of their right to contract might be able to usurp the power arbitrarily to enhance prices, one of the wrongs arising from monopoly, it came to be that laws were passed relating to offenses such as forestalling, regrating and engrossing by which prohibitions were placed upon the power of individuals to deal under such circumstances and conditions as, according to the conception of the times, created a presumption that the dealings were not simply the honest exertion of one's right to contract for his own benefit unaccompanied by a wrongful motive to injure others, but were the consequence of a contract or course of dealing of such a character as to give rise to the presumption of an intent to injure others through the means, for instance, of a monopolistic increase of prices.

This is illustrated by the definition of engrossing found in the statute, 5 and 6 Edw. VI, ch. 14, as follows:

"Whatsoever person or persons . . . shall engross or get into his or their hands by buying, contracting, or promise-taking, other than by demise, grant, or lease of land, or tithe, any corn growing in the fields, or any other corn or grain, butter, cheese, fish, or other dead victual, whatsoever, within the realm of England, to the intent to sell the same again, shall be accepted, reputed, and taken an unlawful engrosser or engrossers."

As by the statutes providing against engrossing the quantity engrossed was not required to be the whole or a proximate part of the whole of an article, it is clear that there was a wide difference between monopoly and engrossing, etc. But as the principal wrong which it was deemed would result from monopoly, that is, an enhancement of the price, was the same wrong to which it was thought the prohibited engrossment would give rise, it came to pass that monopoly and engrossing were regarded as virtually one and the same thing. In other words, the prohibited act of engrossing because of its inevitable accomplishment of one of the evils deemed to be engendered by monopoly, came to be referred to as being a monopoly or constituting an attempt to monopolize. Thus Pollexfen, in his argument in *East India Company* v. *Sandys*, Skin. 165, 169, said:

"By common law, he said that trade is free, and for that cited 3 Inst. 81; F. B. 65; 1 Roll. 4; that the common law is as much against 'monopoly' as 'engrossing;' and that they differ only, that a 'monopoly' is by patent from the king, the other is by the act of the subject between party and party; but that the mischiefs are the same from both, and there is the same law against both. Moore, 673; 11 Rep. 84. The sole trade of anything is 'engrossing' *ex rei natura*, for whosoever hath the sole trade of buying and selling hath 'engrossed' that trade; and who-

soever hath the sole trade to any country, hath the sole trade of buying and selling the produce of that country, at his own price, which is an 'engrossing.' "

And by operation of the mental process which led to considering as a monopoly acts which although they did not constitute a monopoly were thought to produce some of its baneful effects, so also because of the impediment or burden to the due course of trade which they produced, such acts came to be referred to as in restraint of trade. This is shown by my Lord Coke's definition of monopoly as being "an institution or allowance . . . whereby any person or persons, bodies politic or corporate, are sought to be restrained of any freedom or liberty that they had before or hindered in their lawful trade." It is illustrated also by the definition which Hawkins gives of monopoly wherein it is said that the effect of monopoly is to restrain the citizen "from the freedom of manufacturing or trading which he had before." And see especially the opinion of Parker, C. J., in *Mitchel* v. *Reynolds* (1711), 1 P. Williams, 181, where a classification is made of monopoly which brings it generically within the description of restraint of trade.

Generalizing these considerations, the situation is this: 1. That by the common law monopolies were unlawful because of their restriction upon individual freedom of contract and their injury to the public. 2. That as to necessaries of life the freedom of the individual to deal was restricted where the nature and character of the dealing was such as to engender the presumption of intent to bring about at least one of the injuries which it was deemed would result from monopoly, that is an undue enhancement of price. 3. That to protect the freedom of contract of the individual not only in his own interest, but principally in the interest of the common weal, a contract of an individual by which he put an unreasonable restraint upon himself as to carrying on his trade or busi-

ness was void. And that at common law the evils consequent upon engrossing, etc., caused those things to be treated as coming within monopoly and sometimes to be called monopoly and the same considerations caused monopoly because of its operation and effect, to be brought within and spoken of generally as impeding the due course of or being in restraint of trade.

From the development of more accurate economic conceptions and the changes in conditions of society it came to be recognized that the acts prohibited by the engrossing, forestalling, etc., statutes did not have the harmful tendency which they were presumed to have when the legislation concerning them was enacted, and therefore did not justify the presumption which had previously been deduced from them, but, on the contrary, such acts tended to fructify and develop trade. See the statutes of 12th George III, ch. 71, enacted in 1772, and statute of 7 and 8 Victoria, ch. 24, enacted in 1844, repealing the prohibitions against engrossing, forestalling, etc., upon the express ground that the prohibited acts had come to be considered as favorable to the development of and not in restraint of trade. It is remarkable that nowhere at common law can there be found a prohibition against the creation of monopoly by an individual. This would seem to manifest, either consciously or intuitively, a profound conception as to the inevitable operation of economic forces and the equipoise or balance in favor of the protection of the rights of individuals which resulted. That is, to say, as it was deemed that monopoly in the concrete could only arise from an act of sovereign power, and, such sovereign power being restrained, prohibitions as to individuals were directed, not against the creation of monopoly, but were only applied to such acts in relation to particular subjects as to which it was deemed, if not restrained, some of the consequences of monopoly might result. After all, this was but an instinctive recognition

of the truisms that the course of trade could not be made free by obstructing it, and that an individual's right to trade could not be protected by destroying such right.

From the review just made it clearly results that outside of the restrictions resulting from the want of power in an individual to voluntarily and unreasonably restrain his right to carry on his trade or business and outside of the want of right to restrain the free course of trade by contracts or acts which implied a wrongful purpose, freedom to contract and to abstain from contracting and to exercise every reasonable right incident thereto became the rule in the English law. The scope and effect of this freedom to trade and contract is clearly shown by the decision in *Mogul Steamship Co.* v. *McGregor* (1892), A. C. 25. While it is true that the decision of the House of Lords in the case in question was announced shortly after the passage of the Anti-trust Act, it serves reflexly to show the exact state of the law in England at the time the Anti-trust statute was enacted.

In this country also the acts from which it was deemed there resulted a part if not all of the injurious consequences ascribed to monopoly, came to be referred to as a monopoly itself. In other words, here as had been the case in England, practical common sense caused attention to be concentrated not upon the theoretically correct name to be given to the condition or acts which gave rise to a harmful result, but to the result itself and to the remedying of the evils which it produced. The statement just made is illustrated by an early statute of the Province of Massachusetts, that is, chap. 31 of the laws of 1778–1779, by which monopoly and forestalling were expressly treated as one and the same thing.

It is also true that while the principles concerning contracts in restraint of trade, that is, voluntary restraint put by a person on his right to pursue his calling, hence only operating subjectively, came generally to be recognized

in accordance with the English rule, it came moreover to pass that contracts or acts which it was considered had a monopolistic tendency; especially those which were thought to unduly diminish competition and hence to enhance prices—in other words, to monopolize—came also in a generic sense to be spoken of and treated as they had been in England, as restricting the due course of trade, and therefore as being in restraint of trade. The dread of monopoly as an emanation of governmental power, while it passed at an early date out of mind in this country, as a result of the structure of our Government, did not serve to assuage the fear as to the evil consequences which might arise from the acts of individuals producing or tending to produce the consequences of monopoly. It resulted that treating such acts as we have said as amounting to monopoly, sometimes constitutional restrictions, again legislative enactments or judicial decisions, served to enforce and illustrate the purpose to prevent the occurence of the evils recognized in the mother country as consequent upon monopoly, by providing against contracts or acts of individuals or combinations of individuals or. corporations deemed to be conducive to such results. To refer to the constitutional or legislative provisions on the subject or many judicial decisions which illustrate it would unnecessarily prolong this opinion. We append in the margin a note to treatises, &c., wherein are contained references to constitutional and statutory provisions and to numerous decisions, etc., relating to the subject.[1]

It will be found that as modern conditions arose the trend of legislation and judicial decision came more and more to adapt the recognized restrictions to new manifestations of conduct or of dealing which it was thought

---

[1] Purdy's Beach on Private Corporations, vol. 2, pp. 1403, *et seq.*, chapter on Trusts and Monopolies; Cooke on Trade and Labor Combinations, App. II, pp. 194–195; Am. & Eng. Ency. Law, 2d ed., article "Monopolies and Trusts," pp. 844; *et seq.*

justified the inference of intent to do the wrongs which it had been the purpose to prevent from the beginning. The evolution is clearly pointed out in *National Cotton Oil Co.* v. *Texas,* 197 U. S. 115, and *Shawnee Compress Co.* v. *Anderson,* 209 U. S. 423; and, indeed, will be found to be illustrated in various aspects by the decisions of this court which have been concerned with the enforcement of the act we are now considering.

Without going into detail and but very briefly surveying the whole field, it may be with accuracy said that the dread of enhancement of prices and of other wrongs which it was thought would flow from the undue limitation on competitive conditions caused by contracts or other acts of individuals or corporations, led, as a matter of public policy, to the prohibition-or treating as illegal all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy. It is equally true to say that the survey of the legislation in this country on this subject from the beginning will show, depending as it did upon the economic conceptions which obtained at the time when the legislation was adopted or judicial decision was rendered, that contracts or acts were at one time deemed to be of such a character as to justify the inference of wrongful intent which were at another period thought not to be

of that character. But this again, as we have seen, simply followed the line of development of the law of England.

Let us consider the language of the first and second sections, guided by the principle that where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary.[1]

As to the first section, the words to be interpreted are: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce . . . is hereby declared to be illegal." As there is no room for dispute that the statute was intended to formulate a rule for the regulation of interstate and foreign commerce, the question is what was the rule which it adopted?

In view of the common law and the law in this country as to restraint of trade, which we have reviewed, and the illuminating effect which that history must have under the rule to which we have referred, we think it results:

*a.* That the context manifests that the statute was drawn in the light of the existing practical conception of the law of restraint of trade, because it groups as within that class, not only contracts which were in restraint of trade in the subjective sense, but all contracts or acts which theoretically were attempts to monopolize, yet which in practice had come to be considered as in restraint of trade in a broad sense.

*b.* That in view of the many new forms of contracts and combinations which were being evolved from existing economic conditions, it was deemed essential by an all-embracing enumeration to make sure that no form of contract or combination by which an undue restraint of

---

[1] *Swearingen* v. *United States*, 161 U. S. 446; *United States* v. *Wong Kim Ark*, 169 U. S. 649; *Keck* v. *United States*, 172 U. S. 446; *Kepner* v. *United States*, 195 U. S. 100, 126.

interstate or foreign commerce was brought about could save such restraint from condemnation. The statute under this view evidenced the intent not to restrain the right to make and enforce contracts, whether resulting from combination or otherwise, which did not unduly restrain interstate or foreign commerce, but to protect that commerce from being restrained by methods, whether old or new, which would constitute an interference that is an undue restraint.

*c.* And as the contracts or acts embraced in the provision were not expressly defined, since the enumeration addressed itself simply to classes of acts, those classes being broad enough to embrace every conceivable contract or combination which could be made concerning trade or commerce or the subjects of such commerce, and thus caused any act done by any of the enumerated methods anywhere in the whole field of human activity to be illegal if in restraint of trade, it inevitably follows that the provision necessarily called for the exercise of judgment which required that some standard should be resorted to for the purpose of determining whether the prohibitions contained in the statute had or had not in any given case been violated. Thus not specifying but indubitably contemplating and requiring a standard, it follows that it was intended that the standard of reason which had been applied at the common law and in this country in dealing with subjects of the character embraced by the statute, was intended to be the measure used for the purpose of determining whether in a given case a particular act had or had not brought about the wrong against which the statute provided.

And a consideration of the text of the second section serves to establish that it was intended to supplement the first and to make sure that by no possible guise could the public policy embodied in the first section be frustrated or evaded. The prohibitions of the second embrace

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, . . . ." By reference to the terms of § 8 it is certain that the word person clearly implies a corporation as well as an individual.

The commerce referred to by the words "any part" construed in the light of the manifest purpose of the statute has both a geographical and a distributive significance, that is it includes any portion of the United States and any one of the classes of things forming a part of interstate or foreign commerce.

Undoubtedly, the words "to monopolize" and "monopolize" as used in the section reach every act bringing about the prohibited results. The ambiguity, if any, is involved in determining what is intended by monopolize. But this ambiguity is readily dispelled in the light of the previous history of the law of restraint of trade to which we have referred and the indication which it gives of the practical evolution by which monopoly and the acts which produce the same result as monopoly, that is, an undue restraint of the course of trade, all came to be spoken of as, and to be indeed synonymous with, restraint of trade. In other words, having by the first section forbidden all means of monopolizing trade, that is, unduly restraining it by means of every contract, combination, etc., the second section seeks, if possible, to make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the first section, that is, restraints of trade, by any attempt to monopolize, or monopolization thereof, even although the acts by which such results are attempted to be brought about or are brought about be not embraced within the general enumeration of the first section. And, of course, when the second section is thus harmonized with and made as it

was intended to be the complement of the first, it be-
comes obvious that the criteria to be resorted to in any
given case for the purpose of ascertaining whether viola-
tions of the section have been committed, is the rule of
reason guided by the established law and by the plain
duty to enforce the prohibitions of the act and thus the
public policy which its restrictions were obviously enacted
to subserve. And it is worthy of observation, as we have
previously remarked concerning the common law, that
although the statute by the comprehensiveness of the
enumerations embodied in both the first and second sec-
tions makes it certain that its purpose was to prevent
undue restraints of every kind or nature, nevertheless by
the omission of any direct prohibition against monopoly
in the concrete it indicates a consciousness that the free-
dom of the individual right to contract when not unduly
or improperly exercised was the most efficient means for
the prevention of monopoly, since the operation of the
centrifugal and centripetal forces resulting from the right
to freely contract was the means by which monopoly
would be inevitably prevented if no extraneous or sover-
eign power imposed it and no right to make unlawful
contracts having a monopolistic tendency were per-
mitted. In other words that freedom to contract was the
essence of freedom from undue restraint on the right to
contract.

Clear as it seems to us is the meaning of the provisions
of the statute in the light of the review which we have
made, nevertheless before definitively applying that mean-
ing it behooves us to consider the contentions urged on
one side or the other concerning the meaning of the statute,
which, if maintained, would give to it, in some aspects
a much wider and in every view at least a somewhat dif-
ferent significance. And to do this brings us to the second
question which, at the outset, we have stated it was our
purpose to consider and dispose of.

*Second.  The contentions of the parties as to the meaning of
the statute and the decisions of this court relied upon con-
cerning those contentions.*

In substance, the propositions urged by the Govern-
ment are reducible to this: That the language of the stat-
ute embraces every contract, combination, etc., in re-
straint of trade, and hence its text leaves no room for the
exercise of judgment, but simply imposes the plain duty
of applying its prohibitions to every case within its literal
language.  The error involved lies in assuming the matter
to be decided.  This is true because as the acts which may
come under the classes stated in the first section and the
restraint of trade to which that section applies are not
specifically enumerated or defined, it is obvious that
judgment must in every case be called into play in order
to determine whether a particular act is embraced within
the statutory classes, and whether if the act is within such
classes its nature or effect causes it to be a restraint of
trade within the intendment of the act.  To hold to the
contrary would require the conclusion either that every
contract, act or combination of any kind or nature,
whether it operated a restraint on trade or not, was within
the statute, and thus the statute would be destructive of
all right to contract or agree or combine in any respect
whatever as to subjects embraced in interstate trade or
commerce, or if this conclusion were not reached, then the
contention would require it to be held that as the statute
did not define the things to which it related and excluded
resort to the only means by which the acts to which it
relates could be ascertained—the light of reason—the en-
forcement of the statute was impossible because of its
uncertainty.  The merely generic enumeration which the
statute makes of the acts to which it refers and the ab-
sence of any definition of restraint of trade as used in the
statute leaves room for but one conclusion, which is, that
it was expressly designed not to unduly limit the appli-

cation of the act by precise definition, but while clearly
fixing a standard, that is, by defining the ulterior bound-
aries which could not be transgressed with impunity, to
leave it to be determined by the light of reason, guided by
the principles of law and the duty to apply and enforce
the public policy embodied in the statute, in every given
case whether any particular act or contract was within
the contemplation of the statute.

But, it is said, persuasive as these views may be, they
may not be here applied, because the previous decisions
of this court have given to the statute a meaning which
expressly excludes the construction which must result
from the reasoning stated. The cases are *United States* v.
*Freight Association*, 166 U. S. 290, and *United States* v.
*Joint Traffic Association*, 171 U. S. 505. Both the cases
involved the legality of combinations or associations of
railroads engaged in interstate commerce for the purpose
of controlling the conduct of the parties to the association
or combination in many particulars. The association or
combination was assailed in each case as being in viola-
tion of the statute. It was held that they were. It is un-
doubted that in the opinion in each case general language
was made use of, which, when separated from its context,
would justify the conclusion that it was decided that rea-
son could not be resorted to for the purpose of determin-
ing whether the acts complained of were within the stat-
ute. It is, however, also true that the nature and character
of the contract or agreement in each case was fully referred
to and suggestions as to their unreasonableness pointed
out in order to indicate that they were within the pro-
hibitions of the statute. As the cases cannot by any possi-
ble conception be treated as authoritative without the
certitude that reason was resorted to for the purpose of
deciding them, it follows as a matter of course that it must
have been held by the light of reason, since the conclusion
could not have been otherwise reached, that the assailed

contracts or agreements were within the general enumeration of the statute, and that their operation and effect brought about the restraint of trade which the statute prohibited. This being inevitable, the deduction can in reason only be this: That in the cases relied upon it having been found that the acts complained of were within the statute and operated to produce the injuries which the statute forbade, that resort to reason was not permissible in order to allow that to be done which the statute prohibited. This being true, the rulings in the cases relied upon when rightly appreciated were therefore this and nothing more: That as considering the contracts or agreements, their necessary effect and the character of the parties by whom they were made, they were clearly restraints of trade within the purview of the statute, they could not be taken out of that category by indulging in general reasoning as to the expediency or non-expediency of having made the contracts or the wisdom or want of wisdom of the statute which prohibited their being made. That is to say, the cases but decided that the nature and character of the contracts, creating as they did a conclusive presumption which brought them within the statute, such result was not to be disregarded by the substitution of a judicial appreciation of what the law ought to be for the plain judicial duty of enforcing the law as it was made.

But aside from reasoning it is true to say that the cases relied upon do not when rightly construed sustain the doctrine contended for is established by all of the numerous decisions of this court which have applied and enforced the Anti-trust Act, since they all in the very nature of things rest upon the premise that reason was the guide by which the provisions of the act were in every case interpreted. Indeed intermediate the decision of the two cases, that is, after the decision in the *Freight Association Case* and before the decision in the *Joint Traffic Case*, the case of *Hopkins* v. *United States*, 171 U. S. 578, was de-

cided, the opinion being delivered by Mr. Justice Peckham, who wrote both the opinions in the *Freight Association* and the *Joint Traffic cases*. And, referring in the *Hopkins Case* to the broad claim made as to the rule of interpretation announced in the *Freight Association Case*, it was said (p. 592): "To treat as condemned by the act all agreements under which, as a result, the cost of conducting an interstate commercial business may be increased would enlarge the application of the act far beyond the fair meaning of the language used. There must be some direct and immediate effect upon interstate commerce in order to come within the act." And in the *Joint Traffic Case* this statement was expressly reiterated and approved and illustrated by example; like limitation on the general language used in *Freight Association* and *Joint Traffic Cases* is also the clear result of *Bement v. National Harrow Co.*, 186 U. S. 70, 92, and especially of *Cincinnati Packet Co. v. Bay*, 200 U. S. 179.

If the criterion by which it is to be determined in all cases whether every contract, combination, etc., is a restraint of trade within the intendment of the law, is the direct or indirect effect of the acts involved, then of course the rule of reason becomes the guide, and the construction which we have given the statute, instead of being refuted by the cases relied upon, is by those cases demonstrated to be correct. This is true, because as the construction which we have deduced from the history of the act and the analysis of its text is simply that in every case where it is claimed that an act or acts are in violation of the statute the rule of reason, in the light of the principles of law and the public policy which the act embodies, must be applied. From this it follows, since that rule and the result of the test as to direct or indirect, in their ultimate aspect, come to one and the same thing, that the difference between the two is therefore only that which obtains between things which do not differ at all.

If it be true that there is this identity of result between the rule intended to be applied in the *Freight Association Case*, that is, the rule of direct and indirect, and the rule of reason which under the statute as we construe it should be here applied, it may be asked how was it that in the opinion in the *Freight Association Case* much consideration was given to the subject of whether the agreement or combination which was involved in that case could be taken out of the prohibitions of the statute upon the theory of its reasonableness.  The question is pertinent and must be fully and frankly met, for if it be now deemed that the *Freight Association Case* was mistakenly decided or too broadly stated, the doctrine which it announced should be either expressly overruled or limited.

The confusion which gives rise to the question results from failing to distinguish between the want of power to take a case which by its terms or the circumstances which surrounded it, considering among such circumstances the character of the parties, is plainly within the statute, out of the operation of the statute by resort to reason in effect to establish that the contract ought not to be treated as within the statute, and the duty in every case where it becomes necessary from the nature and character of the parties to decide whether it was within the statute to pass upon that question by the light of reason.  This distinction, we think, serves to point out what in its ultimate conception was the thought underlying the reference to the rule of reason made in the *Freight Association Case*, especially when such reference is interpreted by the context of the opinion and in the light of the subsequent opinion in the *Hopkins Case* and in *Cincinnati Packet Company* v. *Bay*, 200 U. S. 179.

And in order not in the slightest degree to be wanting in frankness, we say that in so far, however, as by separating the general language used in the opinions in the *Freight Association* and *Joint Traffic cases* from the con-

text and the subject and parties with which the cases were concerned, it may be conceived that the language referred to conflicts with the construction which we give the statute, they are necessarily now limited and qualified. We see no possible escape from this conclusion if we are to adhere to the many cases decided in this court in which the Anti-trust Law has been applied and enforced and if the duty to apply and enforce that law in the future is to continue to exist. The first is true, because the construction which we now give the statute does not in the slightest degree conflict with a single previous case decided concerning the Anti-trust Law aside from the contention as to the *Freight Association* and *Joint Traffic cases*, and because every one of those cases applied the rule of reason for the purpose of determining whether the subject before the court was within the statute. The second is also true, since, as we have already pointed out, unaided by the light of reason it is impossible to understand how the statute may in the future be enforced and the public policy which it establishes be made efficacious.

So far as the objections of the defendants are concerned they are all embraced under two headings:—

*a.* That the act, even if the averments of the bill be true, cannot be constitutionally applied, because to do so would extend the power of Congress to subjects *dehors* the reach of its authority to regulate commerce, by enabling that body to deal with mere questions of production of commodities within the States. But all the structure upon which this argument proceeds is based upon the decision in *United States* v. *E. C. Knight Co.*, 156 U. S. 1. The view, however, which the argument takes of that case and the arguments based upon that view have been so repeatedly pressed upon this court in connection with the interpretation and enforcement of the Anti-trust Act, and have been so necessarily and expressly decided to be unsound as to cause the contentions to be plainly foreclosed and to require no ex-

press notice. *United States* v. *Northern Securities Co.*, 193
U. S. 197, 334; *Loewe* v. *Lawlor*, 208 U. S. 274; *Swift & Co.*
v. *United States*, 196 U. S. 375; *Montague* v. *Lowry*, 193
U. S. 38; *Shawnee Compress Co.* v. *Anderson*, 209 U. S. 423.

. *b.* Many arguments are pressed in various forms of
statement which in substance amount to contending that
the statute cannot be applied under the facts of this case
without impairing rights of property and destroying the
freedom of contract or trade, which is essentially necessary
to the well-being of society and which it is insisted is pro-
tected by the constitutional guaranty of due process of law.
But the ultimate foundation of all these arguments is the
assumption that reason may not be resorted to in interpret-
ing and applying the statute, and therefore that the statute
unreasonably restricts the right to contract and unreason-
ably operates upon the right to acquire and hold property.
As the premise is demonstrated to be unsound by the con-
struction we have given the statute, of course the proposi-
tions which rest upon that premise need not be further
noticed. .

So far as the arguments proceed upon the conception
that in view of the generality of the statute it is not sus-
ceptible of being enforced by the courts because it cannot
be carried out without a judicial exertion of legislative
power, they are clearly unsound. The statute certainly
generically enumerates the character of acts which it
prohibits and the wrong which it was intended to prevent.
The propositions therefore but insist that, consistently
with the fundamental principles of due process of law, it
never can be left to the judiciary to decide whether in a
given case particular acts come within a generic statutory
provision. But to reduce the propositions, however, to
this their final meaning makes it clear that in substance
they deny the existence of essential legislative authority
and challenge the right of the judiciary to perform duties
which that department of the government has exerted from

the beginning. This is so clear as to require no elaboration. Yet, let us demonstrate that which needs no demonstration, by a few obvious examples. Take for instance the familiar cases where the judiciary is called upon to determine whether a particular act or acts are within a given prohibition, depending upon wrongful intent. Take questions of fraud. Consider the power which must be exercised in every case where the courts are called upon to determine whether particular acts are invalid which are, abstractly speaking, in and of themselves valid, but which are asserted to be invalid because of their direct effect upon interstate commerce.

We come then to the third proposition requiring consideration, viz:.

*Third. The facts and the application of the statute to them.*

Beyond dispute the proofs establish substantially as alleged in the bill the following facts:

1. The creation of the Standard Oil Company of Ohio;

2. The organization of the Standard Oil Trust of 1882, and also a previous one of 1879, not referred to in the bill, and the proceedings in the Supreme Court of Ohio, culminating in a decree based upon the finding that the company was unlawfully a party to that trust; the transfer by the trustees of stocks in certain of the companies; the contempt proceedings; and, finally, the increase of the capital of the Standard Oil Company of New Jersey and the acquisition by that company of the shares of the stock of the other corporations in exchange for its certificates.

The vast amount of property and the possibilities of far-reaching control which resulted from the facts last stated are shown by the statement which we have previously annexed concerning the parties to the trust agreement of 1882, and the corporations whose stock was held by the trustees under the trust and which came therefore to be held by the New Jersey corporation. But these statements do not with accuracy convey an appreciation of the

situation as it existed at the time of the entry of the decree below, since during the more than ten years which elapsed between the acquiring by the New Jersey corporation of the stock and other property which was formerly held by the trustees under the trust agreement, the situation of course had somewhat changed, a change which when analyzed in the light of the proof, we think, establishes that the result of enlarging the capital stock of the New Jersey company and giving it the vast power to which we have referred produced its normal consequence, that is, it gave to the corporation, despite enormous dividends and despite the dropping out of certain corporations enumerated in the decree of the court below, an enlarged and more perfect sway and control over the trade and commerce in petroleum and its products. The ultimate situation referred to will be made manifest by an examination of §§ 2 and 4 of the decree below, which are excerpted in the margin.[1]

---

[1] Section 2. That the defendants John D. Rockefeller, William Rockefeller, Henry H. Rogers, Henry M. Flagler, John D. Archbold, Oliver H. Payne, and Charles M. Pratt, hereafter called the seven individual defendants, united with the Standard Oil Company and other defendants to form and effectuate this combination, and since its formation have been and still are engaged in carrying it into effect and continuing it; that the defendants Anglo-American Oil Company (Limited), Atlantic Refining Company, Buckeye Pipe Line Company, Borne-Scrymser Company, Chesebrough Manufacturing Company, Consolidated, Cumberland Pipe Line Company, Colonial Oil Company, Continental Oil Company, Crescent Pipe Line Company, Henry C. Folger, Jr., and Calvin N. Payne, a copartnership doing business under the firm name and style of Corsicana Refining Company, Eureka Pipe Line Company, Galena Signal Oil Company, Indiana Pipe Line Company, Manhattan Oil Company, National Transit Company, New York Transit Company, Northern Pipe Line Company, Ohio Oil Company, Prairie Oil and Gas Company, Security Oil Company, Solar Refining Company, Southern Pipe Line Company, South Penn Oil Company, Southwest Pennsylvania Pipe Lines Company, Standard Oil Company, of California, Standard Oil Company, of Indiana, Standard Oil Company, of Iowa, Standard Oil

Giving to the facts just stated, the weight which it was deemed they were entitled to, in the light afforded by the

---

Company, of Kansas, Standard Oil Company, of Kentucky, Standard Oil Company, of Nebraska, Standard Oil Company, of New York, Standard Oil Company, of Ohio, Swan and Finch Company, Union Tank Line Company, Vacuum Oil Company, Washington Oil Company, Waters-Pierce Oil Company, have entered into and became parties to this combination and are either actively operating or aiding in the operation of it; that by means of this combination the defendants named in this section have combined and conspired to monopolize, have monopolized, and are continuing to monopolize a substantial part of the commerce among the states, in the territories and with foreign nations, in violation of section 2 of the anti-trust act.

\*        \*        \*        \*        \*        \*        \*        \*        \*

SECTION 4. That in the formation and execution of the combination or conspiracy the Standard Company has issued its stock to the amount of more than $90,000,000 in exchange for the stocks of other corporations which it holds, and it now owns and controls all of the capital stock of many corporations, a majority of the stock or controlling interests in some corporations and stock in other corporations as follows:

| Name of company. | Total capital stock. | Owned by Standard Oil Company. |
|---|---|---|
| Anglo-American Oil Company, Limited | £1,000,000 | £999,740 |
| Atlantic Refining Company............ | $5,000,000 | $5,000,000 |
| Borne-Scrymser Company ............ | 200,000 | 199,700 |
| Buckeye Pipe Line Company.......... | 10,000,000 | 9,999,700 |
| Chesebrough Manufacturing Company, Consolidated...................... | 500,000 | 277,700 |
| Colonial Oil Company................ | 250,000 | 249,300 |
| Continental Oil Company............. | 300,000 | 300,000 |
| Crescent Pipe Line Company ......... | 3,000,000 | 3,000,000 |
| Eureka Pipe Line Company.......... | 5,000,000 | 4,999,400 |
| Galena-Signal Oil Company.......... | 10,000,000 | 7,079,500 |
| Indiana Pipe Line Company ......... | 1,000,000 | 999,700 |
| Lawrence Natural Gas Company ...... | 450,000 | 450,000 |
| Mahoning Gas Fuel Company........ | 150,000 | 149,900 |
| Mountain State Gas Company ....:... | 500,000 | 500,000 |
| National Transit Company .......... | 25,455,200 | 25,451,650 |
| New York Transit Company.......... | 5,000,000 | 5,000,000 |

proof of other cognate facts and circumstances, the court below. held that the acts and dealings established by the

| Name of company. | Total capital stock. | Owned by Standard Oil Company. |
|---|---|---|
| Northern Pipe Line Company. . . . . . . . . | 4,000,000 | 4,000,000 |
| Northwestern Ohio. Natural Gas Company. . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,775,250 | 1,649,450 |
| Ohio Oil Company. . . . . . . . . . . . . . . . . | 10,000,000 | 9,999,850 |
| People's Natural Gas Company . . . . . . | 1,000,000 | 1,000,000 |
| Pittsburg Natural Gas Company . . . . . . | 310,000 | 310,000 |
| Solar Refining Company. . . . . . . . . . . . . | 500,000 | 499,400 |
| Southern Pipe Line Company. . . . . . . . . | 10,000,000 | 10,000,000 |
| South Penn Oil Company. . . . . . . . . . . . | 2,500,000 | 2,500,000 |
| Southwest Pennsylvania Pipe Lines. . . . | 3,500,000 | 3,500,000 |
| Standard Oil Company (of California). . | 17,000,000 | 16,999,500 |
| Standard Oil Company (of Indiana). . . . | 1,000,000 | 999,000 |
| Standard Oil Company (of Iowa). . . . . . | 1,000,000 | 1,000,000 |
| Standard Oil Company (of Kansas). . . . | 1,000,000 | 999,300 |
| Standard Oil Company (of Kentucky). . | 1,000,000 | 997,200 |
| Standard Oil Company (of Nebraska) . . | 600,000 | 599,500 |
| Standard Oil Company (of New York). . | 15,000,000 | 15,000,000 |
| Standard Oil Company (of Ohio) . . . . . | 3,500,000 | 3,499,400 |
| Swan and Finch Company. . . . . . . . . . . | 100,000 | 100,000 |
| Union Tank Line Company. . . . . . . . . . | 3,500,000 | 3,499,400 |
| Vacuum Oil Company. . . . . . . . . . . . . . | 2,500,000 | 2,500,000 |
| Washington Oil Company . . . . . . . . . . . | 100,000 | 71,480 |
| Waters-Pierce Oil Company. . . . . . . . . . | 400,000 | 274,700 |

That the defendant National Transit Company, which is owned and controlled by the Standard Oil. Company as aforesaid, owns and controls the amounts of the capital stocks of the following-named corporations and limited partnerships stated opposite each, respectively, as follows:

| Name of company. | Total capital stock. | Owned by National Transit Company. |
|---|---|---|
| Connecting Gas Company . . . . . . . . . . . | $825,000 | $412,000 |
| Cumberland Pipe Line Company . . . . . . | 1,000,000 | 998,500 |
| East Ohio Gas Company . . . . . . . . . . . . | 6,000,000 | 5,999,500 |
| Franklin Pipe Company, Limited. . . . . . | 50,000 | 19,500 |
| Prairie Oil and Gas Company. . . . . . . . | 10,000,000 | 9,999,500 |

proof operated to destroy the "potentiality of competition" which otherwise would have existed to such an extent as to cause the transfers of stock which were made to the New Jersey corporation and the control which resulted over the many and various subsidiary corporations to be a combination or conspiracy in restraint of trade in violation of the first section of the act, but also to be an attempt to monopolize and a monopolization bringing about a perennial violation of the second section.

We see no cause to doubt the correctness of these conclusions, considering the subject from every aspect, that is, both in view of the facts established by the record and the necessary operation and effect of the law as we have

That the Standard Company has also acquired the control by the ownership of its stock or otherwise of the Security Oil Company, a corporation created under the laws of Texas, which owns a refinery at Beaumont in that State, and the Manhattan Oil Company, a corporation, which owns a pipe line situated in the States of Indiana and Ohio; that the Standard Company, and the corporations and partnerships named in Section 2, are engaged in the various branches of the business of producing, purchasing and transporting petroleum in the principal oil-producing districts of the United States, in New York, Pennsylvania, West Virginia, Tennessee, Kentucky, Ohio, Indiana, Illinois, Kansas, Oklahoma, Louisiana, Texas, Colorado and California, in shipping and transporting the oil through pipe lines owned or controlled by these companies from the various oil-producing districts into and through other states, in refining the petroleum and manufacturing it into various products, in shipping the petroleum and the products thereof into the states and territories of the United States, the District of Columbia and to foreign nations, in shipping the petroleum and its products in tank cars owned or controlled by the subsidiary companies into various states and territories of the United States and into the District of Columbia, and in selling the petroleum and its products in various places in the states and territories of the United States, in the District of Columbia and in foreign countries; that the Standard Company controls the subsidiary companies and directs the management thereof so that none of the subsidiary companies competes with any other of those companies or with the Standard Company, but their trade is all managed as that of a single person.

construed it upon the inferences deducible from the facts, for the following reasons:

*a.* Because the unification of power and control over petroleum and its products which was the inevitable result of the combining in the New Jersey corporation by the increase of its stock and the transfer to it of the stocks of so many other corporations, aggregating so vast a capital, gives rise, in and of itself, in the absence of countervailing circumstances, to say the least, to the *prima facie* presumption of intent and purpose to maintain the dominancy over the oil industry, not as a result of normal methods of industrial development, but by new means of combination which were resorted to in order that greater power might be added than would otherwise have arisen had normal methods been followed, the whole with the purpose of excluding others from the trade and thus centralizing in the combination a perpetual control of the movements of petroleum and its products in the channels of interstate commerce.

*b.* Because the *prima facie* presumption of intent to restrain trade, to monopolize and to bring about monopolization resulting from the act of expanding the stock of the New Jersey corporation and vesting it with such vast control of the oil industry, is made conclusive by considering, *1*, the conduct of the persons or corporations who were mainly instrumental in bringing about the extension of power in the New Jersey corporation before the consummation of that result and prior to the formation of the trust agreements of 1879 and 1882; *2*, by considering the proof as to what was done under those agreements and the acts which immediately preceded the vesting of power in the New Jersey corporation as well as by weighing the modes in which the power vested in that corporation has been exerted and the results which have arisen from it.

Recurring to the acts done by the individuals or corporations who were mainly instrumental in bringing about the

expansion of the New Jersey corporation during the period prior to the formation of the trust agreements of 1879 and 1882, including those agreements, not for the purpose of weighing the substantial merit of the numerous charges of wrongdoing made during such period, but solely as an aid for discovering intent and purpose, we think no disinterested mind can survey the period in question without being irresistibly driven to the conclusion that the very genius for commercial development and organization which it would seem was manifested from the beginning soon begot an intent and purpose to exclude others which was frequently manifested by acts and dealings wholly inconsistent with the theory that they were made with the single conception of advancing the development of business power by usual methods, but which on the contrary necessarily involved the intent to drive others from the field and to exclude them from their right to trade and thus accomplish the mastery which was the end in view. And, considering the period from the date of the trust agreements of 1879 and 1882, up to the time of the expansion of the New Jersey corporation, the gradual extension of the power over the commerce in oil which ensued, the decision of the Supreme Court of Ohio, the tardiness or reluctance in conforming to the commands of that decision, the method first adopted and that which finally culminated in the plan of the New Jersey corporation, all additionally serve to make manifest the continued existence of the intent which we have previously indicated and which among other things impelled the expansion of the New Jersey corporation. The exercise of the power which resulted from that organization fortifies the foregoing conclusions, since the development which came, the acquisition here and there which ensued of every efficient means by which competition could have been asserted, the slow but resistless methods which followed by which means of transportation were absorbed and brought under control,

the system of marketing which was adopted by which the country was divided into districts and the trade in each district in oil was turned over to a designated corporation within the combination and all others were excluded, all lead the mind up to a conviction of a purpose and intent which we think is so certain as practically to cause the subject not to be within the domain of reasonable contention.

The inference that no attempt to monopolize could have been intended, and that no monopolization resulted from the acts complained of, since it is established that a very small percentage of the crude oil produced was controlled by the combination, is unwarranted. As substantial power over the crude product was the inevitable result of the absolute control which existed over the refined product, the monopolization of the one carried with it the power to control the other, and if the inferences which this situation suggests were developed, which we deem it unnecessary to do, they might well serve to add additional cogency to the presumption of intent to monopolize which we have found arises from the unquestioned proof on other subjects.

We are thus brought to the last subject which we are called upon to consider, viz:

*Fourth. The remedy to be administered.*

It may be conceded that ordinarily where it was found that acts had been done in violation of the statute, adequate measure of relief would result from restraining the doing of such acts in the future. *Swift* v. *United States*, 196 U. S. 375. But in a case like this, where the condition which has been brought about in violation of the statute, in and of itself, is not only a continued attempt to monopolize, but also a monopolization, the duty to enforce the statute requires the application of broader and more controlling remedies. As penalties which are not authorized by law may not be inflicted by judicial authority, it follows that to meet the situation with which we are confronted

the application of remedies two-fold in character becomes essential: 1st. To forbid the doing in the future of acts like those which we have found to have been done in the past which would be violative of the statute. 2d. The exertion of such measure of relief as will effectually dissolve the combination found to exist in violation of the statute, and thus neutralize the extension and continually operating force which the possession of the power unlawfully obtained has brought and will continue to bring about.

In applying remedies for this purpose, however, the fact must not be overlooked that injury to the public by the prevention of an undue restraint on, or the monopolization of trade or commerce is the foundation upon which the prohibitions of the statute rest, and moreover that one of the fundamental purposes of the statute is to protect, not to destroy, rights of property.

Let us then, as a means of accurately determining what relief we are to afford, first come to consider what relief was afforded by the court below, in order to fix how far it is necessary to take from or add to that relief, to the end that the prohibitions of the statute may have complete and operative force.

The court below by virtue of §§ 1, 2, and 4 of its decree, which we have in part previously excerpted in the margin, adjudged that the New Jersey corporation in so far as it held the stock of the various corporations, recited in §§ 2 and 4 of the decree, or controlled the same was a combination in violation of the first section of the act, and an attempt to monopolize or a monopolization contrary to the second section of the act. It commanded the dissolution of the combination, and therefore in effect, directed the transfer by the New Jersey corporation back to the stockholders of the various subsidiary corporations entitled to the same of the stock which had been turned over to the New Jersey company in exchange for its stock. To

make this command effective § 5 of the decree forbade the New Jersey corporation from in any form or manner exercising any ownership or exerting any power directly or indirectly in virtue of its apparent title to the stocks of the subsidiary corporations, and prohibited those subsidiary corporations from paying any dividends to the New Jersey corporation or doing any act which would recognize further power in that company, except to the extent that it was necessary to enable that company to transfer the stock. So far as the owners of the stock of the subsidiary corporations and the corporations themselves were concerned after the stock had been transferred, § 6 of the decree enjoined them from in any way conspiring or combining to violate the act or to monopolize or attempt to monopolize in virtue of their ownership of the stock transferred to them, and prohibited all agreements between the subsidiary corporations or other stockholders in the future, tending to produce or bring about further violations of the act.

By § 7, pending the accomplishment of the dissolution of the combination by the transfer of stock and until it was consummated, the defendants named in § 2, constituting all the corporations to which we have referred, were enjoined from engaging in or carrying on interstate commerce. And by § 9, among other things a delay of thirty days was granted for the carrying into effect of the directions of the decree.

So far as the decree held that the ownership of the stock of the New Jersey corporation constituted a combination in violation of the first section and an attempt to create a monopoly or to monopolize under the second section and commanded the dissolution of the combination, the decree was clearly appropriate. And this also is true of § 5 of the decree which restrained both the New Jersey corporation and the subsidiary corporations from doing anything which would recognize or give effect to further ownership

in the New Jersey corporation of the stocks whicĥ were ordered to be retransferred.

But the contention is that, in so far as the relief by way of injunction which was awarded by § 6 against the stockholders of the subsidiary corporations or the subsidiary corporations themselves after the transfer of stock by the New Jersey corporation was completed in conformity to the decree, the relief awarded was too broad: a. Because it was not sufficiently specific and tended to cause those who were within the embrace of the order to cease to be under the protection of the law of the land and required them to thereafter conduct their business under the jeopardy of punishments for contempt for violating a general injunction. *New Haven R. R.* v. *Interstate Commerce Commission,* 200 U. S. 404. Besides it is said that the restraint imposed by § 6—even putting out of view the consideration just stated—was moreover calculated to do injury to the public and it may be in and of itself to produce the very restraint on the due course of trade which it was intended to prevent. We say this since it does not necessarily follow because an illegal restraint of trade or an attempt to monopolize or a monopolization resulted from the combination and the transfer of the stocks of the subsidiary corporations to the New Jersey corporation that a like restraint or attempt to monopolize or monopolization would necessarily arise from agreements between one or more of the subsidiary corporations after the transfer of the stock by the New Jersey corporation. For illustration, take the pipe lines. By the effect of the transfer of the stock the pipe lines would come under the control of various corporations instead of being subjected to a uniform control. If various corporations owning the lines determined in the public interests to so combine as to make a continuous line, such agreement or combination would not be repugnant to the act, and yet it might be restrained by the decree. As another example, take the

Union Tank Line Company, one of the subsidiary corporations, the owner practically of all the tank cars in use by the combination. If no possibility existed of agreements for the distribution of these cars among the subsidiary corporations, the most serious detriment to the public interest might result. Conceding the merit, abstractly considered, of these contentions they are irrelevant. We so think, since we construe the sixth paragraph of the decree, not as depriving the stockholders or the corporations, after the dissolution of the combination, of the power to make normal and lawful contracts or agreements, but as restraining them from, by any device whatever, recreating directly or indirectly the illegal combination which the decree dissolved. In other words we construe the sixth paragraph of the decree, not as depriving the stockholders or corporations of the right to live under the law of the land, but as compelling obedience to that law. As therefore the sixth paragraph as thus construed is not amenable to the criticism directed against it and cannot produce the harmful results which the arguments suggest it was obviously right. We think that in view of the magnitude of the interests involved and their complexity that the delay of thirty days allowed for executing the decree was too short and should be extended so as to embrace a period of at least six months. So also, in view of the possible serious injury to result to the public from an absolute cessation of interstate commerce in petroleum and its products by such vast agencies as are embraced in the combination, a result which might arise from that portion of the decree which enjoined carrying on of interstate commerce not only by the New Jersey corporation but by all the subsidiary companies until the dissolution of the combination by the transfer of the stocks in accordance with the decree, the injunction provided for in § 7 thereof should not have been awarded.

Our conclusion is that the decree below was right and

should be affirmed, except as to the minor matters concerning which we have indicated the decree should be modified. Our order will therefore be one of affirmance with directions, however, to modify the decree in accordance with this opinion. The court below to retain jurisdiction to the extent necessary to compel compliance in every respect with its decree.

*And it is so ordered.*

MR. JUSTICE HARLAN concurring in part, and dissenting in part.

A sense of duty constrains me to express the objections which I have to certain declarations in the opinion just delivered on behalf of the court.

I concur in holding that the Standard Oil Company of New Jersey and its subsidiary companies constitute a combination in restraint of interstate commerce, and that they have attempted to monopolize and have monopolized parts of such commerce—all in violation of what is known as the Anti-trust Act of 1890. 26 Stat. 209, c. 647. The evidence in this case overwhelmingly sustained that view and led the Circuit Court, by its final decree, to order the dissolution of the New Jersey corporation and the discontinuance of the illegal combination between that corporation and its subsidiary companies.

In my judgment, the decree below should have been affirmed without qualification. But the court, while affirming the decree, directs some modifications in respect of what it characterizes as "minor matters." It is to be apprehended that those modifications may prove to be mischievous. In saying this, I have particularly in view the statement in the opinion that "it does not necessarily follow that because an illegal restraint of trade or an attempt to monopolize or a monopolization resulted from the combination and the transfer of the stocks of the subsidiary corporations to the New Jersey corporation,

that a like restraint of trade or attempt to monopolize or monopolization would necessarily arise from agreements between one or more of the subsidiary corporations after the transfer of the stock by the New Jersey corporation." Taking this language, in connection with other parts of the opinion, the subsidiary companies are thus, in effect, informed—unwisely, I think—that although the New Jersey corporation, being an illegal combination, must go out of existence, *they* may join in an agreement *to restrain commerce* among the States if such restraint be not "undue."

In order that my objections to certain parts of the court's opinion may distinctly appear, I must state the circumstances under which Congress passed the Anti-trust Act, and trace the course of judicial decisions as to its meaning and scope. This is the more necessary because the court by its decision, when interpreted by the language of its opinion, has not only upset the long-settled interpretation of the act, but has usurped the constitutional functions of the legislative branch of the Government. With all due respect for the opinions of others, I feel bound to say that what the court has said may well cause some alarm for the integrity of our institutions. Let us see how the matter stands.

All who recall the condition of the country in 1890 will remember that there was everywhere, among the people generally, a deep feeling of unrest. The Nation had been rid of human slavery—fortunately, as all now feel—but the conviction was universal that the country was in real danger from another kind of slavery sought to be fastened on the American people, namely, the slavery that would result from aggregations of capital in the hands of a few individuals and corporations controlling, for their own profit and advantage exclusively, the entire business of the country, including the production and sale of the necessaries of life. Such a danger was thought to be then

imminent, and all felt that it must be met firmly and by such statutory regulations as would adequately protect the people against oppression and wrong. Congress therefore took up the matter and gave the whole subject the fullest consideration. All agreed that the National Government could not, by legislation, regulate the domestic trade carried on wholly within the several States; for, power to regulate such trade remained with, because never surrendered by, the States. But, under authority expressly granted to it by the Constitution, Congress could regulate commerce among the several States and with foreign states. Its authority to regulate such commerce was and is paramount, due force being given to other provisions of the fundamental law devised by the fathers for the safety of the Government and for the protection and security of the essential rights inhering in life, liberty and property.

Guided by these considerations, and to the end that the people, *so far as interstate commerce* was concerned, might not be dominated by vast combinations and monopolies, having power to advance their own selfish ends, regardless of the general interests and welfare, Congress passed the Anti-trust Act of 1890 in these words (the italics here and elsewhere in this opinion are mine):

"Sec. 1. *Every* contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make *any such contract or engage in any such combination or conspiracy,* shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. § 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons,

to monopolize *any part* of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. § 3. *Every* contract, combination in form of trust *or otherwise,* or conspiracy, in restraint of trade or commerce in any Territory of the United States or in the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is hereby declared illegal. Every person who shall make any *such* contract or engage in any *such* combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 26 Stat. 209, c. 647.

The important inquiry in the present case is as to the meaning and scope of that act in its application to interstate commerce.

In 1896 this court had occasion to determine the meaning and scope of the act in an important case known as the *Trans-Missouri Freight Case.* 166 U. S. 290. The question there was as to the validity under the Anti-trust Act of a certain agreement between numerous railroad companies, whereby they formed an association for the purpose of establishing and maintaining rates, rules and regulations in respect of freight traffic over specified routes. Two questions were involved: first, whether the act applied to railroad carriers; second, whether the agreement the annulment of which as illegal was the basis of the suit which the United States brought. The court

held that railroad carriers were embraced by the act. In determining that question, the court, among other things, said:

"The language of the act includes *every* contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations. So far as the very terms of the statute go, they apply to *any* contract of the nature described. A contract therefore that is in restraint of trade or commerce is, by the strict language of the act prohibited, even though such contract is entered into between competing common carriers by railroad, and only for the purposes of thereby affecting traffic rates for the transportation of persons and property. If such an agreement restrains trade or commerce, it is prohibited by the statute, unless it can be said that an agreement, no matter what its terms, relating only to transportation cannot restrain trade or commerce. We see no escape from the conclusion that if an agreement of such a nature does restrain it, the agreement is condemned by this act. . . . Nor is it for the substantial interests of the country that any one commodity should be within the sole power and subject to the sole will of one powerful combination of capital. Congress has, so far as its jurisdiction extends, prohibited *all* contracts or combinations in the form of trusts entered into for the purpose of restraining trade and commerce. . . . . While the statute prohibits all combinations in the form of trusts or otherwise, the limitation is not confined to that form alone. *All* combinations which are *in restraint of trade or commerce* are prohibited, whether in the form of trusts or *in any other form whatever.*" *United States* v. *Freight Assn.*, 166 U. S. 290, 312, 324, 326.

The court then proceeded to consider the second of the above questions, saying: "The next question to be discussed is as to what is the true construction of the statute,

assuming that it applies to common carriers by railroad. What is the meaning of the language as used in the statute, that 'every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States or with foreign nations, is hereby declared to be illegal?' Is it confined to a contract or combination which is only in unreasonable restraint of trade or commerce, or does it include what the language of the act plainly and in terms covers, all contracts of that nature? It is now with much amplification of argument urged that the statute, in declaring illegal every combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, does not mean what the language used therein plainly imports, but that it only means to declare illegal any such contract which is in *unreasonable* restraint of trade, while leaving all others unaffected by the provisions of the act; that the common law meaning of the term 'contract in restraint of trade' includes only such contracts as are in *unreasonable* restraint of trade, and when that term is used in the Federal statute it is not intended to include all contracts in restraint of trade, but only those which are in unreasonable restraint thereof. . . . By the simple use of the term 'contract in restraint of trade,' *all* contracts of that nature, whether valid or otherwise, would be included, and *not alone that kind of contract which was invalid and unenforceable as being in unreasonable restraint of trade.* When, therefore, the body of an act pronounces as illegal every contract or combination in restraint of trade or commerce among the several States, etc., the plain and ordinary meaning of such language is not limited to that kind of contract alone which is in unreasonable restraint of trade, but *all* contracts are included in such language, and no exception or limitation can be added without placing in the act that which has been omitted by Congress. . . . If only that kind of contract

which is in unreasonable restraint of trade be within the meaning of the statute, and declared therein to be illegal, it is at once apparent that the subject of what is a reasonable rate is attended with great uncertainty.  .  .  . To say, therefore, that the act excludes agreements which are not in unreasonable restraint of trade, and which tend simply to keep up reasonable rates for transportation, is substantially to leave the question of unreasonableness to the companies themselves. . . . But assuming that agreements of this nature are not void at common law and that the various cases cited by the learned courts below show it, the answer to the statement of their validity now is to be found *in the terms of the statute* under consideration. . . . The arguments which have been addressed to us against the inclusion of all contracts in restraint of trade, as provided for by the language of the act, have been based upon the alleged presumption that Congress, notwithstanding the language of the act, could not have intended to embrace all contracts, but only such contracts as were in unreasonable restraint of trade.  Under these circumstances we are, therefore, asked to hold that the act of Congress excepts contracts which are not in unreasonable restraint of trade, and which only keep rates up to a reasonable price, notwithstanding the language of the act makes no such exception.  In other words, we are asked to read into the act *by way of judicial legislation an exception that is not placed there by the lawmaking branch of the Government*, and this is to be done upon the theory that the impolicy of such legislation is so clear that it cannot be supposed Congress intended the natural import of the language it used.  This *we cannot and ought not to do.*  .  .  .

"If the act ought to read, as contended for by defendants, *Congress is the body to amend it and not this court, by a process of judicial legislation wholly unjustifiable.*  Large numbers do not agree that the view taken by defendants

is sound or true in substance, and Congress may and very probably did share in that belief in passing the act.   The public policy of the Government is to be found *in its statutes,* and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials; but when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, *public policy in such a case is what the statute enacts.*   If the law prohibit any contract or combination in restraint of trade or commerce, a contract or combination made in violation of such law is void, whatever may have been theretofore decided by the courts to have been the public policy of the country on that subject.   The conclusion which we have drawn from the examination above made into the question before us is that the Anti-trust Act applies to railroads, and that it renders illegal *all* agreements which are *in restraint* of trade or commerce as we have above defined that expression, and the question then arises whether the agreement before us is of that nature."

I have made these extended extracts from the opinion of the court in the *Trans-Missouri Freight Case* in order to show beyond question, that the point was there urged by counsel that the Anti-trust Act condemned *only* contracts, combinations, trusts and conspiracies that were in *unreasonable* restraint of interstate commerce, and that the court in clear and decisive language met that point. It adjudged that Congress had in unequivocal words declared that "*every* contract, combination, in the form of trust or otherwise, or conspiracy, in restraint of commerce among the several States" shall be illegal, and that no distinction, *so far as interstate commerce was concerned,* was to be tolerated between restraints of such commerce as were undue or unreasonable, and restraints that were due or reasonable.   With full knowledge of the then condition of the country and of its business, Congress deter-

mined to meet, and did meet, the situation by an absolute, statutory prohibition of "*every* contract, combination in the form of trust or otherwise, in restraint of trade or commerce." Still more; in response to the suggestion by able counsel that Congress intended only to strike down such contracts, combinations and monopolies as unreasonably restrained interstate commerce, this court, in words too clear to be misunderstood, said that to so hold was "to read into the act by way of *judicial legislation*, an exception not placed there by the law-making branch of the Government." "This," the court said, as we have seen. "*we cannot* and *ought not* to do."

It thus appears that fifteen years ago, when the purpose of Congress in passing the Anti-trust Act was fresh in the minds of courts, lawyers, statesmen and the general public, this court expressly declined to indulge in judicial legislation, by inserting in the act the word "unreasonable" or any other word of like import. It may be stated here that the country at large accepted this view of the act, and the Federal courts throughout the entire country enforced its provisions according to the interpretation given in the *Freight Association Case*. What, then, was to be done by those who questioned the soundness of the interpretation placed on the act by this court in that case? As the court had decided that to insert the word "unreasonable" in the act would be "judicial legislation" on its part, the only alternative left to those who opposed the decision in that case was to induce Congress to so *amend* the act as to recognize the right to restrain interstate commerce to a *reasonable* extent. The public press, magazines and law journals, the debates in Congress, speeches and addresses by public men and jurists, all contain abundant evidence of the general understanding that the meaning, extent and scope of the Anti-trust Act had been judicially determined by this court, and that the only question remaining open for discussion was the

wisdom of the policy declared by the act—a matter that was exclusively within the cognizance of Congress. But at every session of Congress since the decision of 1896, the lawmaking branch of the Government, with full knowledge of that decision, has refused to change the policy it had declared or to so amend the act of 1890 as to except from its operation contracts, combinations and trusts that *reasonably* restrain interstate commerce.

But those who were in combinations that were illegal did not despair. They at once set up the baseless claim that the decision of 1896 disturbed the "business interests of the country," and let it be known that they would never be content until the rule was established that would permit interstate commerce to be subjected to *reasonable* restraints. Finally, an opportunity came again to raise the same question which this court had, upon full consideration, determined in 1896. I now allude to the case of *United States* v. *Joint Traffic Association,* 171 U. S. 505, decided in 1898. What was that case?

It was a suit by the United States against more than thirty railroad companies to have the court declare illegal, under the Anti-trust Act, a certain agreement between these companies. The relief asked was denied in the subordinate Federal courts and the Government brought the case here.

It is important to state the points urged in that case by the defendant companies charged with violating the Anti-trust Act, and to show that the court promptly met them. To that end I make a copious extract from the opinion in the *Joint Traffic Case.* Among other things, the court said: "Upon comparing that agreement [the one in the *Joint Traffic Case,* then under consideration, 171 U. S. 505] with the one set forth in the case of *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, the great similarity between them suggests that a similar result should be reached in the two cases" (p. 558).

Learned counsel in the *Joint Traffic Case* urged a reconsideration of the question decided in the *Trans-Missouri Case* contending that "the decision in that case [the *Trans-Missouri Freight Case*] is quite plainly erroneous, and the consequences of such error are far reaching and disastrous, and clearly at war with justice and sound policy, and the construction placed upon the Anti-trust statute has been received by the public with surprise and alarm." They suggested that the point made in the *Joint Traffic Case* as to the meaning and scope of the act might have been but was not made in the previous case. The court said (171 U. S. 559) that "the report of the *Trans-Missouri Case* clearly shows not only that the point now taken *was* there urged upon the attention of the court, but it was then *intentionally* and *necessarily* decided."

The question whether the court should again consider the point decided in the *Trans-Missouri Case*, 171 U. S. 573, was disposed of in the most decisive language, as follows: "Finally, we are asked to reconsider the question decided in the *Trans-Missouri Case*, and to retrace the steps taken therein, because of the plain error contained in that decision and the widespread alarm with which it was received and the serious consequences which have resulted, or may soon result, from the law as interpreted in that case. It is proper to remark that an application for a reconsideration of a question but lately decided by this court is usually based upon a statement that some of the arguments employed on the original hearing of the question have been overlooked or misunderstood, or that some controlling authority has been either misapplied by the court or passed over without discussion or notice. While this is not strictly an application for a rehearing in the same case, yet in substance it is the same thing. The court is asked to reconsider a question but just decided after a careful investigation of the matter involved. There have heretofore been in effect two arguments of precisely the same

questions now before the court, and the same arguments were addressed to us on both those occasions. The report of the *Trans-Missouri Case* shows a dissenting opinion delivered in that case, and that the opinion was concurred in by three other members of the court. That opinion, it will be seen, gives with great force and ability the arguments against the decision which was finally arrived at by the court. It was after a full discussion of the questions involved and with the knowledge of the views entertained by the minority as expressed in the dissenting opinion, that the majority of the court came to the conclusion it did. Soon after the decision a petition for a rehearing of the case was made, supported by a printed argument in its favor, and pressed with an earnestness and vigor and at a length which were certainly commensurate with the importance of the case. This court, *with care and deliberation* and also with a full appreciation of their importance, again considered the questions involved in its former decision. A majority of the court once more arrived at the conclusion it had first announced, and accordingly it denied the application. And now *for the third time* the same arguments are employed, and the court is again asked to recant its former opinion, and to decide the same question in direct opposition to the conclusion arrived at in the *Trans-Missouri Case.* The learned counsel while making the application frankly confess that the argument in opposition to the decision in the case above named has been so fully, so clearly and so forcibly presented in the dissenting opinion of Mr. Justice White [in the *Freight Case*] that it is hardly possible to add to it, nor is it necessary to repeat it. The fact that there was so close a division of opinion in this court when the matter was first under advisement, together with the different views taken by some of the judges of the lower courts, led us to the most careful and scrutinizing examination of the arguments advanced by both sides, and it was after such an examination that the majority of

the court came to the conclusion it did. It is not now alleged that the court on the former occasion overlooked any argument for the respondents or misapplied any controlling authority. It is simply insisted that the court, notwithstanding the arguments for an opposite view, arrived at an erroneous result, which, for reasons already stated, ought to be reconsidered and reversed. *As we have twice already deliberately and earnestly considered the same arguments which are now for a third time pressed upon our attention,* it could hardly be expected that our opinion should now change from that already expressed."

These utterances, taken in connection with what was previously said in the *Trans-Missouri Freight Case,* show so clearly and affirmatively as to admit of no doubt that this court, many years ago, upon the fullest consideration, interpreted the Anti-trust Act as prohibiting and making illegal not only *every* contract or combination, in whatever form, which was in restraint of interstate commerce, without regard to its reasonableness or unreasonableness, but all monopolies or attempts to monopolize "any part" of such trade or commerce. Let me refer to a few other cases in which the scope of the decision in the *Freight Association Case* was referred to: In *Bement* v. *National Harrow Co.,* 186 U. S. 70, 92, the court said: "It is true that it has been held by this court that the act (Anti-trust Act) included any restraint of commerce, whether *reasonable or unreasonable* "—citing *United States* v. *Trans-Missouri Freight Asso.,* 166 U. S. 290; *United States* v. *Joint Traffic Association,* 171 U. S. 505; *Addyston Pipe &c. Co.* v. *United States,* 175 U. S. 211. In *Montague* v. *Lowry,* 193 U. S. 38, 46, which involved the validity, under the Anti-trust Act, of a certain association formed for the sale of tiles, mantels, and grates, the court referring to the contention that the sale of tiles in San Francisco was so small "as to be a negligible quantity," held that the association was nevertheless a combination in restraint of interstate trade or com-

merce in violation of the Anti-trust Act. In *Loewe* v. *Lawlor*, 208 U. S. 274, 297, all the members of this court concurred in saying that the *Trans-Missouri*, *Joint Traffic* and *Northern Securities cases* "hold in effect that the Anti-trust Law has a broader application than the prohibition of restraints of trade unlawful at common law." In *Shawnee Compress Co.* v. *Anderson* (1907), 209 U. S. 423, 432, 434, all the members of the court again concurred in declaring that "it has been decided that not only unreasonable but all direct restraints of trade are prohibited, the law being thereby distinguished from the common law." In *United States* v. *Addyston Pipe Company*, 85 Fed. Rep. 271, 278, Judge Taft, speaking for the Circuit Court of Appeals for the Sixth Circuit, said that according to the decision of this court in the *Freight Association Case*, "contracts in restraint of interstate transportation were within the statute, whether the restraints could be regarded as reasonable at common law or not." In *Chesapeake & Ohio Fuel Co.* v. *United States* (1902), 115 Fed. Rep. 610, 619, the Circuit Court of Appeals for the Sixth Circuit, after referring to the right of Congress to regulate interstate commerce, thus interpreted the prior decisions of this court in the *Trans-Missouri*, the *Joint Traffic* and the *Addyston Pipe and Steel Co. cases:* "In the exercise of this right, Congress has seen fit to prohibit *all* contracts in restraint of trade. It has not left to the courts the consideration of the question whether such restraint is reasonable or unreasonable, or whether the contract would have been illegal at the common law or not. The act leaves for consideration by judicial authority no question of this character, but *all* contracts and combinations are declared illegal if in restraint of trade or commerce among the States." As far back as *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 497, it was held that certain local regulations, subjecting drummers engaged in both interstate and domestic trade, could not be sustained by reason of the fact that no discrimina-

tion was made among citizens of the different States. The court observed that this did not meet the difficulty, for the reason that "interstate commerce cannot be taxed *at all.*" Under this view Congress no doubt acted, when by the Anti-trust Act it forbade *any* restraint whatever upon interstate commerce. It manifestly proceeded upon the theory that interstate commerce could not be restrained *at all* by combinations, trusts or monopolies, but must be allowed to flow in its accustomed channels, wholly unvexed and unobstructed by anything that would restrain its ordinary movement. See also *Minnesota* v. *Barber,* 136 U. S. 313, 326; *Brimmer* v. *Rebman,* 138 U. S. 78, 82, 83.

In the opinion delivered on behalf of the minority in the *Northern Securities Case,* 193 U. S. 197, our present Chief Justice referred to the contentions made by the defendants in the *Freight Association Case,* one of which was that the agreement there involved did not unreasonably restrain interstate commerce, and said: "Both these contentions were decided against the association, the court holding that the Anti-trust Act did embrace interstate carriage by railroad corporations, and as that act prohibited *any* contract in restraint of interstate commerce, *it hence embraced all contracts of that character, whether they were reasonable or unreasonable.*" One of the Justices who dissented in the *Northern Securities Case* in a separate opinion, concurred in by the minority, thus referred to the *Freight* and *Joint Traffic cases:* "For it cannot be too carefully remembered that that clause applies to ' every ' contract of the forbidden kind—a consideration which was the turning point of the *Trans-Missouri Freight Association* case. . . . Size has nothing to do with the matter. A monopoly of 'any part' of commerce among the States is unlawful."

In this connection it may be well to refer to the adverse report made in 1909, by Senator Nelson, on behalf of the Senate Judiciary Committee, in reference to a certain bill

offered in the Senate and which proposed to amend the Anti-trust Act in various particulars. That report contains a full, careful and able analysis of judicial decisions relating to combinations and monopolies in restraint of trade and commerce. Among other things said in it which bear on the questions involved in the present case are these: "The Anti-trust Act makes it a criminal offense to violate the law, and provides a punishment both by fine and imprisonment. To inject into the act the question of whether an agreement or combination is *reasonable* or *unreasonable* would render the act as a criminal or penal statute indefinite and uncertain, and hence, to that extent, utterly nugatory and void, and would practically amount to a repeal of that part of the act. . . . And while the same technical objection does not apply to civil prosecutions, *the injection of the rule of reasonableness or unreasonableness would lead to the greatest variableness and uncertainty in the enforcement of the law. The defense of reasonable restraint would be made in every case and there would be as many different rules of reasonableness as cases, courts and juries.* What one court or jury might deem unreasonable another court or jury might deem reasonable. A court or jury in Ohio might find a given agreement or combination reasonable, while a court and jury in Wisconsin might find the same agreement and combination unreasonable. In the case of *People* v. *Sheldon*, 139 N. Y. 264, Chief Justice Andrews remarks: 'If agreements and combinations to prevent competition in prices are or may be hurtful to trade, *the only sure remedy is to prohibit all agreements of that character.* If the validity of such an agreement was made to depend upon actual proof of public prejudice or injury, it would be very difficult in any case to establish the invalidity, although the moral evidence might be very convincing.' . . . To amend the Anti-trust Act, as suggested by this bill, would be to entirely emasculate it, and for all practical purposes render it nugatory as a reme-

dial statute. Criminal prosecutions would not lie and civil remedies would labor under the greatest doubt and uncertainty. The act as it exists is clear, comprehensive, certain and highly remedial. It practically covers the field of Federal jurisdiction, and is in every respect a model law. To destroy or undermine it at the present juncture, when combinations are on the increase, and appear to be as oblivious as ever of the rights of the public, would be a calamity." The result was the indefinite postponement by the Senate of any further consideration of the proposed amendments of the Anti-trust Act.

After what has been adjudged, upon full consideration, as to the meaning and scope of the Anti-trust Act, and in view of the usages of this court when attorneys for litigants have attempted to reopen questions that have been deliberately decided, I confess to no little surprise as to what has occurred in the present case. The court says that the previous cases, above cited, "cannot by any possible conception be treated as authoritative without the certitude that *reason* was resorted to for the purpose of deciding them." And its opinion is full of intimations that this court proceeded in those cases, so far as the present question is concerned, without being guided by the "rule of reason," or "the light of reason." It is more than once intimated, if not suggested, that if the Anti-trust Act is to be construed as prohibiting *every* contract or combination, of whatever nature, which is in fact in restraint of commerce, regardless of the reasonableness or unreasonableness of such restraint, that fact would show that the court had not proceeded, in its decision, according to "the light of reason," but had disregarded the "rule of reason." If the court, in those cases, was wrong in its construction of the act, it is certain that it fully apprehended the views advanced by learned counsel in previous cases and pronounced them to be untenable. The published reports place this beyond all question. The opinion of the court

was delivered by a Justice of wide experience as a judicial officer, and the court had before it the Attorney General of the United States and lawyers who were recognized, on all sides, as great leaders in their profession.    The same eminent jurist who delivered the opinion in the *Trans-Missouri Case* delivered the opinion in the *Joint Traffic Association Case*, and the Association in that case was represented by lawyers whose ability was universally recognized. Is it to be supposed that any point escaped notice in those cases when we think of the sagacity of the Justice who expressed the views of the court, or of the ability of the profound, astute lawyers, who sought such an interpretation of the act as would compel the court to insert words in the statute which Congress had not put there, and the insertion of which words, would amount to "judicial legislation"?    Now this court is asked to do that which it has distinctly declared it could not and would not do, and has now done what it then said it could not constitutionally do.    It has, by mere interpretation, modified the act of Congress, and deprived it of practical value as a defensive measure against the evils to be remedied.    On reading the opinion just delivered, the first inquiry will be, that as the court is unanimous in holding that the particular things done by the Standard Oil Company and its subsidiary companies, in this case, were illegal under the Anti-trust Act, whether those things were in reasonable or unreasonable restraint of interstate commerce, why was it necessary to make an elaborate argument, as is done in the opinion, to show that according to the "rule of reason" the act as passed by Congress should be interpreted as if it contained the word "unreasonable" or the word "undue"?    The only answer which, in frankness, can be given to this question is, that the court intends to decide that its deliberate judgment, fifteen years ago, to the effect that the act permitted no restraint whatever of interstate commerce, whether reasonable or unreasonable, was not in accordance with

the "rule of reason." In effect the court says, that it will now, for the first time, bring the discussion under the "light of reason" and apply the "rule of reason" to the questions to be decided. I have the authority of this court for saying that such a course of proceeding on its part would be "judicial legislation."

Still more, what is now done involves a serious departure from the settled usages of this court. Counsel have not ordinarily been allowed to discuss questions already settled by previous decisions. More than once at the present term, that rule has been applied. In *St. Louis, I. M. & S. Ry. Co.* v. *Taylor*, 210 U. S. 281, 295, the court had occasion to determine the meaning and scope of the original Safety Appliance Act of Congress passed for the protection of railroad employés and passengers on interstate trains. 27 Stat. 531, § 5, c. 196. A particular construction of that act was insisted upon by the interstate carrier which was sued under the Safety Appliance Act; and the contention was that a different construction, than the one insisted upon by the carrier, would be a harsh one. After quoting the words of the act, Mr. Justice Moody said for the court: "There is no escape from the meaning of these words. Explanation cannot clarify them, and ought not to be employed to confuse them or lessen their significance. The obvious purpose of the legislature was *to supplant the qualified duty of the common law with an absolute duty deemed by it more just.* If the railroad does, in point of fact, use cars which do not comply with the standard, it violates the plain prohibitions of the law, and there arises from that violation the liability to make compensation to one who is injured by it. It is urged that this is a harsh construction. To this we reply that, if it be the true construction, its harshness is no concern of the courts. *They have no responsibility for the justice or wisdom of legislation, and no duty except to enforce the law as it is written, unless it is clearly beyond the constitutional power of the lawmaking*

*body*. . . . .   It is quite conceivable that Congress, contemplating the inevitable hardship of such injuries, and hoping to diminish the economic loss to the community resulting from them, should deem it wise to impose their burdens upon those who could measurably control their causes, instead of upon those who are in the main helpless in that regard. Such a policy would be intelligible, and, to say the least, not so unreasonable as to require us to doubt that it was intended, and to seek some unnatural interpretation of common words. We see no error in this part of the case." And at the present term of this court we were asked, in a case arising under the Safety Appliance Act, to reconsider the question decided in the *Taylor Case*. We declined to do so, saying in an opinion just now handed down: "In view of these facts, we are unwilling to regard the question as to the meaning and scope of the Safety Appliance Act, so far as it relates to automatic couplers on trains moving in interstate traffic, as open to further discussion here. *If the court was wrong in the Taylor case the way is open for such an amendment of the statute as Congress may, in its discretion, deem proper.* This court ought not now to disturb what has been so widely accepted and acted upon by the courts as having been decided in that case. A contrary course would cause infinite uncertainty, if not mischief, in the administration of the law in the Federal courts. To avoid misapprehension, it is appropriate to say that we are not to be understood as questioning the soundness of the interpretation heretofore placed by this court upon the Safety Appliance Act. We only mean to say that until Congress, by an amendment of the statute, changes the rule announced in the *Taylor Case*, this court will adhere to and apply that rule." *C., B. & Q. Ry. Co. v. United States,* 220 U. S. 559. When counsel in the present case insisted upon a reversal of the former rulings of this court, and asked such an interpretation of the Anti-trust Act as would allow reasonable restraints of interstate commerce, this

court, in deference to established practice, should, I submit, have said to them: "That question, according to our practice, is not open for further discussion here. This court long ago deliberately held (1) that the act, interpreting its words in their ordinary acceptation, prohibits *all* restraints of interstate commerce by combinations in whatever form, and whether reasonable or unreasonable; (2) the question relates to matters of public policy in reference to commerce among the States and with foreign nations, and Congress alone can deal with the subject; (3) this court would encroach upon the authority of Congress if, under the guise of construction, it should assume to determine a matter of public policy; (4) the parties must go to Congress and obtain an amendment of the Anti-trust Act if they think this court was wrong in its former decisions; and (5) this court cannot and will not *judicially legislate*, since its function is to declare the law, while it belongs to the legislative department to make the law. Such a course, I am sure, would not have offended the "rule of reason."

But my brethren, in their wisdom, have deemed it best to pursue a different course. They have now said to those who condemn our former decisions and who object to all legislative prohibitions of contracts, combinations and trusts in restraint of interstate commerce, "You may *now* restrain such commerce, provided you are reasonable about it; only take care that the restraint in not undue." The disposition of the case under consideration, according to the views of the defendants, will, it is claimed, quiet and give rest to "the business of the country." On the contrary, I have a strong conviction that it will throw the business of the country into confusion and invite widely-extended and harassing litigation, the injurious effects of which will be felt for many years to come. When Congress prohibited *every* contract, combination or monopoly, in restraint of commerce, it prescribed a simple, definite rule that all could understand, and which could be easily ap-

plied by everyone wishing to obey the law, and not to conduct their business in violation of law. But now, it is to be feared, we are to have, in cases without number, the constantly recurring inquiry—difficult to solve by proof—whether the particular contract, combination, or trust involved in each case is or is not an "unreasonable" or "undue" restraint of trade. Congress, in effect, said that there should be *no* restraint of trade, *in any form,* and this court solemnly adjudged many years ago that Congress meant what it thus said in clear and explicit words, and that it *could not* add to the words of the act. But those who condemn the action of Congress are now, in effect, informed that the courts will allow such restraints of interstate commerce as are shown not to be unreasonable or undue.

It remains for me to refer, more fully than I have heretofore done, to another, and, in my judgment—if we look to the future—the most important aspect of this case. That aspect concerns the usurpation by the judicial branch of the Government of the functions of the legislative department. The illustrious men who laid the foundations of our institutions, deemed no part of the National Constitution of more consequence or more essential to the permanancy of our form of government than the provisions under which were distributed the powers of Government among three separate, equal and coördinate departments —legislative, executive, and judicial. This was at that time a new feature of governmental regulation among the nations of the earth, and it is deemed by the people of every section of our own country as most vital in the workings of a representative republic whose Constitution was ordained and established in order to accomplish the objects stated in its Preamble by the means, *but only by the means,* provided either expressly or by necessary implication, by the instrument itself. No department of that government can constitutionally exercise the

powers committed strictly to another and separate department.

I said at the outset that the action of the court in this case might well alarm thoughtful men who revered the Constitution. I meant by this that many things are intimated and said in the court's opinion which will not be regarded otherwise than as sanctioning an invasion by the judiciary of the constitutional domain of Congress—an attempt by interpretation to soften or modify what some regard as a harsh public policy. This court, let me repeat, solemnly adjudged many years ago that it could not, except by "*judicial legislation*," read words into the Antitrust Act not put there by Congress, and which, being inserted, give it a meaning which the words of the Act, as passed, if properly interpreted, would not justify. The court has decided that it could not thus change a public policy formulated and declared by Congress; that Congress has paramount authority to regulate interstate commerce, and that it alone can change a policy once inaugurated by legislation. The courts have nothing to do with the wisdom or policy of an act of Congress. Their duty is to ascertain the will of Congress, and if the statute embodying the expression of that will is constitutional, the courts must respect it. They have no function to declare a public policy, nor to *amend* legislative enactments. "What is termed the policy of the Government with reference to any particular legislation," as this court has said, "is generally a very uncertain thing, upon which all sorts of opinions, each variant from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes." *Hadden* v. *Collector*, 5 Wall. 107. Nevertheless, if I do not misapprehend its opinion, the court has now read into the act of Congress words which are not to be found there, and has thereby done that which it adjudged in 1896 and 1898 could not be done without violating

the Constitution, namely, by interpretation of a statute, changed a public policy declared by the legislative department.

After many years of public service at the National Capital, and after a somewhat close observation of the conduct of public affairs, I am impelled to say that there is abroad, in our land, a most harmful tendency to bring about the amending of constitutions and legislative enactments by means alone of judicial construction.  As a public policy has been declared by the legislative department in respect of interstate commerce, over which Congress has entire control, under the Constitution, all concerned must patiently submit to what has been lawfully done, until the People of the United States—the source of all National power—shall, in their own time, upon reflection and through the legislative department of the Government, require a change of that policy.  There are some who say that it is a part of one's liberty to conduct commerce among the States without being subject to governmental authority.  But that would not be liberty, regulated by law, and liberty, which cannot be regulated by law, is not to be desired.  The Supreme Law of the Land—which is binding alike upon all—upon Presidents, Congresses, the Courts and the People—gives to Congress, and to Congress alone, authority to regulate interstate commerce, and when Congress forbids *any* restraint of such commerce, in any form, all must obey its mandate.  To overreach the action of Congress merely by judicial construction, that is, by indirection, is a blow at the integrity of our governmental system, and in the end will prove most dangerous to all.  Mr. Justice Bradley wisely said, when on this Bench, that illegitimate and unconstitutional practices get their first footing by silent approaches and slight deviations from legal modes of legal procedure.  *Boyd* v. *United States*, 116 U. S. 616, 635.  We shall do well to heed the warnings of that great jurist.

I do not stop to discuss the merits of the policy embodied in the Anti-trust Act of 1890; for, as has been often adjudged, the courts, under our constitutional system, have no rightful concern with the wisdom or policy of legislation enacted by that branch of the Government which alone can make laws.

For the reasons stated, while concurring in the general affirmance of the decree of the Circuit Court, I dissent from that part of the judgment of this court which directs the modification of the decree of the Circuit Court, as well as from those parts of the opinion which, in effect, assert authority, in this court, to insert words in the Anti-trust Act which Congress did not put there, and which, being inserted, Congress is made to declare, as part of the public policy of the country, what it has not chosen to declare.